OPINION
Defendant-appellant, Daily L. Shepherd, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas, pursuant to a jury verdict finding appellant guilty of one count of murder with a firearm specification.
The charges against appellant arose out of the shooting death of Jeffrey Carpenter on February 19, 1996, on East 21st Avenue, Columbus, Ohio. Appellant was indicted on July 11, 1996 on one count of murder with a firearm specification, and a jury trial commenced on July 27, 1998.
The first witness for the prosecution was Officer Jack Rennie, of the Columbus Division of Police. Officer Rennie testified that on the night in question, he and his partner were the first officers on the scene of the shooting, where they found the victim lying between the street and sidewalk in front of 1190 East 21st Avenue. Officer Rennie ascertained that the victim was unresponsive and had no pulse, and called for medical assistance. He and his partner then secured the area and interviewed the only civilian whom they had found present upon arriving at the scene, although a large crowd of on-lookers had later gathered after police had begun to illuminate and tape-off the area. At the time of his testimony, Officer Rennie could not identify the individual whom he had interviewed at the scene, but it appears to have been Ronald Cross, who later testified at trial. The individual was later referred by Officer Rennie to homicide detectives for further interview.
Officer Rennie and his partner were then instructed to canvas the neighborhood, which they did without garnering any useful information due to the neighbors' unwillingness to become involved in the investigation. Some .380 auto shell casings were collected from the scene by the crime scene search unit.
Detective Mark L. Henson, of the Columbus Division of Police, also testified for the state. He was the detective assigned to the crime scene search unit who investigated the homicide in question. He identified the shell casings collected from the scene, and also a broken beer bottle found near the victim which was collected for possible evidence. No useful fingerprints were recovered either from the shell casings or the beer bottle.
Dr. Patrick Fardall, a forensic pathologist with the Franklin County Coroner's Office, testified that he performed the autopsy on Jeffrey Carpenter. The victim presented five gunshot wounds, reflected in five entry wounds and two exit wounds. One exit wound had been caused by two projectiles leaving the body in the same area, causing a single defect. Two projectiles were recovered from the body. The victim had been shot four times in the head and neck and once in the abdomen, all from the left side. Three of the five gunshot wounds would each have been considered fatal. The absence of stippling or soot indicated that the shots had been fired from a distance greater than three feet, assuming the bullets had not traveled through an intervening object. Beyond that, the distance from which the shots were fired could not be accurately determined. Dr. Fardall testified that toxicology results indicated combined consumption by the victim of both alcohol and cocaine over a period of hours before his death.
The state also presented the testimony of Tyrone Michael Sneed, an acquaintance of both the victim and the appellant. Sneed had a prior felony drug record, and testified that he had received a favorable plea bargain on a more recent felony drug charge in exchange for his testimony in appellant's case. Sneed testified that he had known the victim, Jeff Carpenter, for over twelve years. Carpenter was a friend, and a crack cocaine user who purchased drugs from Sneed. Sneed testified that he also knew appellant from the neighborhood, and had known him for perhaps three or four years. Sneed first learned of Jeff Carpenter's death on the night of the shooting when another friend paged him at a motel. Sneed then went back to his "bootleg joint," or after-hours club, where he discussed the shooting with friends. The next day Sneed saw appellant at a neighborhood store and they discussed the shooting. Sneed asked the appellant if he had shot Jeff Carpenter, and appellant answered that he had "handled his business." Sneed then testified that appellant "didn't really get into detail about it."
At this point in Sneed's testimony, the prosecution asked for a sidebar and requested that the court declare Sneed a hostile witness, based upon differences between Sneed's prior statements to the prosecution and his current testimony. The prosecution apparently had elicited prior statements from Sneed to the effect that appellant had explicitly told him, during the conversation in question, that he had shot the victim. Counsel for appellant opposed the request to have the witness declared hostile, on the basis that the prosecution had not shown surprise or established that the witness was identified with the appellant. The court nonetheless granted the prosecution's request to proceed as on cross with a hostile witness.
Using leading questions, the prosecution then confronted Sneed with his prior statement that appellant had explicitly admitted shooting Jeff Carpenter. The prosecution also confronted Sneed with alleged prior statements that the shooting had been over a $5 drug debt. The witness denied both prior statements, saying that the prosecution had misunderstood the witness's attribution of the statements to other speakers. The prosecution then asked the court for permission to impeach the testimony of Sneed, its own witness, with a prior tape-recording of his statements. Counsel for defendant objected, stating that the prosecution was attempting to bootstrap its own version of the facts through leading questions posed to its own witness, without a sufficient showing of surprise or affirmative damage which would permit the state to impeach. The court overruled the objection and allowed the prosecution to continue to impeach the witness.
Sneed's subsequent testimony, interspersed and interrupted with frequent colloquia between counsel and court, became imprecise and often contradictory on the source of the hearsay evidence which the prosecution desired to introduce by means of Sneed's prior statements regarding the existence of a $5 drug dispute between appellant and the victim, and appellant's subsequent statement that he had shot the victim. The state eventually moved on to other areas of questioning and abandoned its attempt to refresh the witness's recollection by means of the tape-recording of a prior police interview. In the new line of questioning, the state elicited numerous references from the witness regarding the appellant's prior drug dealing activities, in an attempt to relate this to the purported $5 drug dealing debt which allegedly led to the disagreement between the appellant and the victim.
On cross-examination by the defense, Sneed testified that at the time in question, he operated a boot-leg joint at 111 East 22nd Avenue, in Columbus, where he sold liquor and beer without a license. Sneed also testified that he sold drugs to his customers, and other persons would sell drugs on the premises as well. The witness attempted to explain inconsistencies between the prior taped statements made to investigating police detectives and his testimony in court, regarding who had told him that the shooting arose out of a drug debt and the exact statement made by the appellant to Sneed on the day after the shooting. Sneed also described an incident after the murder but prior to trial in which he had been approached and threatened by appellant father and one of appellant's friends, who was armed with a handgun.
The state also called Shayne Antwon Jenkins as a witness. Jenkins described himself as eighteen years of age, and related by blood to the victim, Jeffrey Carpenter, whom he knew well. Jenkins also knew the appellant from the neighborhood. Jenkins described his relationship with appellant as friendly but not overly close. After Jenkins heard about Jeff Carpenter's death, he had a conversation with appellant the morning after the murder. He noticed that appellant had shaved his head. The two walked down to the scene of the shooting where they could see blood and other traces of the murder. The appellant gave no indication at that time that he was involved in the shooting. Several weeks later, Jenkins and appellant had another conversation while drinking in a bar, and Jenkins, who had apparently heard in the interim that the appellant was involved in the shooting, asked appellant what had provoked him. The appellant described trading some bad crack to the victim in exchange for an asthma inhaler which turned out to be empty, so that both parties in the transaction had succeeded in cheating each other. The appellant described to Jenkins how he eventually became very angry over the transaction, went home and took a cold shower to calm down, but could not. The appellant then stated to Jenkins, "you know the rest from there." Jenkins and appellant never discussed the shooting again thereafter.
Jenkins also described a black foreign car owned by a crack user in the neighborhood, who frequently traded its use to drug dealers in exchange for drugs. At the time of the murder, the witness stated that the vehicle was in the possession of appellant and his associates. Jenkins also described a gun owned by appellant as a chrome plated .380 automatic. Jenkins described appellant as a known drug dealer and operator of a small crack house in the neighborhood.
On cross-examination, Jenkins stated that he could not precisely recall who had told him that appellant was involved in the murder, but it was a general rumor around the neighborhood. Jenkins also described Sneed as the person who had told him about the victim owing money to the defendant. Jenkins further clarified that after the bad deal, or mutually defrauding transaction, of the inhaler for bad crack cocaine between appellant and victim, the victim somehow secured a quantity of real crack cocaine from appellant. The witness described himself as not interested specifically in seeing the appellant convicted, but testifying only in the interest in seeing justice done in the murder of Jeff Carpenter.
Ronald Cross then testified for the prosecution. He described himself as a resident of the area on East 21st Avenue where the shooting occurred. He knew the appellant from the neighborhood and had purchased crack cocaine from appellant for his personal use. On the night in question, Cross was walking along 21St Avenue to the corner store when he noticed a small black foreign car pull up slowly next to him. He recognized appellant as the passenger. From the way the car was being driven, as well as the expression on appellant's face, Cross "knew something was going to happen," and began walking behind some adjacent apartments to avoid the situation. As he did so, he walked within twenty feet of two other men who were walking together in the other direction, towards 21St Avenue. Cross walked behind the apartment building and immediately heard five or six gunshots. The car he had seen earlier then pulled down the alley, and he felt that perhaps he had attracted the attention of the occupants, so he once again attempted to avoid the situation by reversing direction and walking away from the car back towards 21St Avenue. Although it was night time, the street was well-lighted and Cross had no problem recognizing appellant as the person in the vehicle, based upon his prior transactions with appellant, although he did not know appellant's name at the time. He saw the passenger rejoin the car and get in, after which the car drove away. As Cross walked back towards 21St Avenue, he found a body lying near the sidewalk, whom he recognized as one of the two men on foot he had passed moments earlier.
Cross further testified that sometime later, immediately before trial, an investigator had presented him with a photo array, from which he had selected appellant's photograph as the passenger in the black car on the night of the murder. When Cross was interviewed by police at the scene of the murder, he described everything he had observed, but did not tell the police that he had recognized the passenger of the car, because he was concerned over his safety in the neighborhood if he identified anyone associated with the shooting. Cross described the time lapse when he first noticed the black car until he heard the shots as perhaps a minute and another thirty seconds until he saw the car's passenger re-enter the vehicle in the alley.
On cross-examination, Cross stated that he was a former drug user but had ceased using drugs when his daughter was born. Cross was not familiar with any of the other people implicated in the case other than appellant, and did not know the victim. Cross gave his motivation for testifying as wanting to see his daughter grow up in a world safe from similar shootings. He specified that in the night in question he saw no weapons in possession of either the victim or the people in the black car. He had never before seen the victim's companion, and had not seen him again since the night of the shooting.
The state called Michael Crump, and attempted to elicit testimony to the effect that appellant had made statements implicating himself in the homicide. Crump immediately testified that he had not heard appellant make such statements, and the prosecution, after only a few questions, asked the court to declare Crump as a hostile witness. The court did so over the objection of the defense. The prosecution confronted Crump with prior statements, which Crump refused to adopt. Crump stated that he knew nothing about the case, that prior to trial he had told the prosecutor that he knew nothing about the case and that he had nothing further to add. On cross-examination, the defense confirmed that Crump had earlier in the day told the prosecution that he had nothing to testify about concerning the case.
The final substantive witness for the state was Steven Womack, formerly a fellow inmate with appellant at the Franklin County Workhouse awaiting trial. Womack testified that he had received a favorable plea bargain in exchange for his testimony in the present case. Womack's testimony concerned statements made by appellant while they were both incarcerated. In these jail-house conversations, appellant told Womack that he had killed a crackhead because the victim was a witness in another crime. Later appellant bragged that he was a successful drug dealer and that he had had to kill an addict who worked for him soliciting other addicts into the crack house. Appellant told Womack that this "runner" had begun working for someone else and that appellant had committed a "drive-by" in order to "get the message out." Appellant also stated that he would never be convicted because he had paid off alibi witnesses and that appellant's reputation would protect him from testimony by his neighbors.
In a later conversation, appellant described to Womack how he had shot his victim five times, that the victim's name was Jeff, and that the shooting occurred on 21St Avenue.
Womack testified that he approached police with his story because he had been present at conversation in which appellant boasted he would have a police detective killed, and Womack was afraid that he himself would be implicated by being privy to such a conversation.
The defense called Daily Shepherd, Jr., appellant's father, as a witness. At the time of the shooting, appellant lived with his father and mother on East 21St Avenue, not far from the scene of the shooting. On the night of the shooting, Mr. Shepherd heard gunshots in the neighborhood. Appellant had left the house several hours before. Mr. and Mrs. Shepherd received a phone call from their daughter Vanessa, who lived down the street in the immediate vicinity of the shooting. Mr. Shepherd walked down the street to his daughter's house and found her there with appellant and appellant's friend, Emmett. Appellant was not acting in any way unusual, and did not have a gun with him. Mr. Shepherd did not believe that his son was a drug dealer. Mr. Shepherd had never seen his son with a chrome .380 automatic, or any other weapon. The defense also called Claudia Shepherd, appellant's mother, whose testimony largely confirmed that of her husband concerning the events on the night of the murder.
The defense also called appellant's sister, Vanessa Green. Vanessa testified that at the time of the murders, she lived on East 21St Avenue very near the murder scene. She did not hear gunshots herself but a neighbor, Terrance Powell, came bursting though the door saying that somebody had been shot outside. Vanessa went out to look and saw police cruisers and a crowd gathering. Vanessa's mother called saying she had paged appellant for him to call Vanessa. Appellant did call Vanessa shortly thereafter, and seemed to be calm and not upset in any way. Appellant then came over to Vanessa's house within a few minutes in the company of his friend Emmett. Again, appellant did not appear to be acting unusual in any way.
The defense next called Shavon Whiteside. She testified that on the night of the murder, appellant was visiting at her house on Cleveland Avenue in company with his friend Emmett McCoy. Appellant then received a page and used the telephone. Shavon, her boyfriend Nate Martin, Emmett and appellant had been at the house for several hours beforehand playing cards. After appellant received the page, he asked for a ride to his sister's house. Nate and Shavon drove appellant and Emmett to Vanessa's house and dropped him off in the alley because the street was blocked by police cruisers and crime scene tape out front. Shavon did not see either appellant or any other guest carrying a gun on the night in question.
Emmett McCoy testified for the defense, and confirmed Shavon's version of appellant's activities on the evening of the murder. Emmett picked up appellant at his parent's home early in the evening, took him to Shavon's house for several hours, during which they played cards and listened to music, then went with appellant to Vanessa's house after she had paged appellant. Emmett described Nate's car as a maroon two-door Honda. Emmett's testimony did differ from that of Shavon in one respect, regarding the timing of his arrival at her home. Emmett testified that he arrived earlier, then left to pick up appellant, whereas Shavon testified that appellant and Emmett had arrived together.
Nate Martin testified for the defense, and confirmed appellant's alibi for the night as testified to by Shavon and Emmett.
Terrance Powell was the final witness for the defense. He testified that on the night of the murder he lived with his mother at 1219 East 21St Avenue, next door to Vanessa Green. Terrance heard gunshots as he was going out the front door. He saw someone shooting nearby down the street, and someone else running away. The shooter got into a black four-door car which drove away. There was a street light over the scene but Terrance could not recognize any of the individuals involved. He ran next door to Vanessa Green's house where his mother was and told her what had happened. Soon thereafter, he was in back of the house when Nate Martin pulled up in his maroon two-door Honda and dropped off appellant and Emmett McCoy. On cross-examination, Terrance stated that he had not seen the victim of the shooting nor had he seen the face of the gunman.
The matter thereafter went to the jury, which returned a verdict of guilty on one count of murder with a firearm specification. The court sentenced appellant to a term of imprisonment of fifteen years to life, with an additional three years actual incarceration on the firearm specification. Appellant has timely appealed and brings the following assignments of error:
 1. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT IN PERMITTING THE STATE TO ASK LEADING QUESTIONS OF ITS OWN WITNESS, TYRONE SNEED, IN VIOLATION OF EVID. R. 611.
 2. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT IN PERMITTING THE SETATE [sic] TO IMPEACH ITS OWN WITNESS, TYRONE SNEED, WITH PRIOR INCONSISTENT STATEMENTS ABSENT SURPRISE AND AFFIRMATIVE DAMAGE IN VIOLATION OF EVID. R. 607.
 3. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING THE STATE TO ELICIT TESTIMONY RELATIVE TO ALLEGED POOR CHARACTER OF THE DEFENDANT.
 4. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT, THE DEFENSE OBJECTION TO THE STATE'S RACE BASED EXCLUSION BY PREEMPTORY CHALLENGE OF A POTENTIAL JUROR.
 5. DEFENDANT WAS DENIED A FAIR TRIAL AS THE TRIAL COURT REFUSED TO UTILIZE A PANEL FROM A FAIR CROSS SECTION OF THE COMMUNITY FROM WHICH TO SELECT THE JURY.
Appellant's first assignment of error asserts that the trial court erred in granting the prosecution's request that its own witness, Tyrone Sneed, be declared a hostile witness. Appellant's second assignment of error asserts that the trial court erred in permitting the prosecution to impeach Sneed in the subsequent examination as on cross. The two assignments present interrelated issues and will be addressed together.
In the present case, the prosecution sought to have Sneed declared as a hostile witness preliminary to impeaching his testimony which was not developing satisfactorily in the eyes of the prosecutor.
Pursuant to Evid.R. 611(C), "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." In addition, the trial court may determine that a witness is hostile based upon the witness's demeanor during examination. State v.Stearns (1982), 7 Ohio App.3d 11, 14; State v. Warren (1990),67 Ohio App.3d 789. "A witness that identifies himself with an opposing party by prior acts or expressed intentions may be questioned as if on cross-examination by the party calling the witness." State v. Matthews (Sept. 26, 1997), Clark App. No. 96-CA-0011, unreported, citing State v. Dolce (1993), 92 Ohio App.3d 687,704.
The record shows no indication in the present case that Sneed was in any way hostile in his demeanor during the brief time he was on the stand before the prosecution moved to have him declared a hostile witness. Nor is there any indication that Sneed was in any way identified with the APPELLANT; his initial testimony was that he knew the victim, Jeff Carpenter, and considered him "good people" and "nice." The record shows that the prosecution may have been disappointed with Sneed's testimony, specifically in that he quoted appellant as saying only that he had "handled his business," rather than the more explicit quote "I shot him" which the prosecution hoped to attribute to appellant. This discrepancy between the prosecution's aspirations for this witness, and the testimony actually given, does not rise to the level of evasion or uncooperativeness which would impede the prosecution's direct examination and justify the use of leading questions. There was therefore no basis for the trial court to declare Sneed a hostile witness under Evid.R. 611, and it was error to do so.
Because impeachment of a party's own witness will of necessity be conducted by means of leading questions, the distinction between the requirements of Evid.R. 607, governing impeachment, and Evid.R. 611, governing hostile witnesses, has been much blurred in Ohio. Indeed, Ohio courts have treated the rules somewhat interchangeably: "Evid.R. 607 requires `a showing of surprise and affirmative damage' before the court is authorized to declare a witness hostile and allow a party to impeach its own witness." State v. Asher (1996), 112 Ohio App.3d 646, 652, citingState v. Holmes (1987), 30 Ohio St.3d 20. (Emphasis added.)
Evid.R. 607 provides:
 The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage.
Surprise can be shown when a witness's testimony is materially inconsistent with a prior written or oral statement and when counsel did not have reason to believe that the witness would recant when called to testify. Holmes, at 23; State v. Cantlebarry
(1990), 69 Ohio App.3d 216. The issue of whether a party has been taken by surprise by the witness' s testimony is entrusted to the sound discretion of the trial court. State v. Diehl (1981),67 Ohio St.2d 389, 391. Affirmative damage occurs when a party's own witness testifies to facts that contradict, deny or harm the party's position. State v. Lewis (1991), 75 Ohio App.3d 689;Asher, supra.
On the present record, the state can claim neither surprise nor affirmative damage from Sneed's brief initial testimony which led to impeachment by the prosecution. The witness was voir dired extensively prior to, and during interruptions in, his testimony. During voir dire, the witness referred repeatedly to prior conversations with the prosecutor, in which he had indicated that he would not adopt his prior tape-recorded statement regarding the alleged quote "I shot him" by appellant, but instead testify that his recollection all along had been that appellant claimed to have "taken care of his business." The witness also claimed to have corrected the prosecutor during these earlier conversations, regarding the origin of the quote regarding a $5 debt alleged to exist between appellant and the victim, and that the witness attributed no such statement to appellant:
 Q. ALL RIGHT. WHEN YOU TALKED TO MR. MALOON YESTERDAY BEFORE YOU CAME IN THE COURT, DID YOU AND MR. MALOON TALK ABOUT THE FIVE DOLLARS AND WHO YOU SAID TALKED ABOUT THE FIVE DOLLARS?
 A. WE TALKED ABOUT THE WHOLE THING. HE HAD ME READ IT. AND WE CORRECTED ALL OF IT AND WENT THROUGH IT.
Q. AND DID YOU CORRECT WITH HIM?
 A. I DID CORRECT WITH HIM ABOUT THE FIVE DOLLAR THING THAT HE WAS — JEFF CAME TO MY HOUSE AND TOLD ME ABOUT THAT. I DID CORRECT THAT.
 Q. OKAY. AND YOU TOLD MR. MALOON THAT DAILY, DAILY DIDN'T TELL ME ABOUT THE FIVE DOLLARS.
JEFF CARPENTER TOLD ME ABOUT THE FIVE DOLLARS?
 A. RIGHT. YESTERDAY, YOU SAID SUSTAINED AND SAID THAT'S HEARSAY AND WHAT NOT.
* * *
 Q. ALL RIGHT. DID YOU TELL HIM ANYTHING MORE THAN THAT?
 DID YOU TELL HIM, WHAT I SAID ON THE TAPE, IF I GAVE HIM MORE DETAIL ON THE TAPE, THAT DAILY SHOT HIM?
 A. NO, NO. ON THE TAPE, HE SHOWED ME THE PAPER WHERE HE SAID, I SHOT HIM, FLAT OUT.
 AND THEN YESTERDAY, I READ IT YESTERDAY. I SAID I DON'T REMEMBER. THAT'S WHAT I SAID.
 BUT I REMEMBER HE SAID, TAKING CARE OF HIS BUSINESS. THAT'S WHAT HE SAID, YES.
 AND TAKING CARE OF HIS BUSINESS, AND THAT IS — I MEAN, IT CAN MEAN A NUMBER OF THINGS' FIGHT, KILL, BUST HIM ON THE HEAD, OR ANYTHING. (Tr. pg. 266-268)
There is thus insufficient support in the record to support the proposition that the prosecution suffered either surprise or affirmative damage sufficient to impeach its own witness. The prosecutor does not contest in the record that Sneed had clearly indicated what his ultimate testimony at trial would be. Manifestly, there were conversations between the witness and prosecutor on this issue which would have alerted the state as to what testimony would be forthcoming. While the prosecution may have found Sneed's testimony inadequate, this does not equate with surprise and affirmative damage.
Through leading questions in the attempt to impeach Sneed, the prosecution was able to introduce exactly the language it desired the jury to hear, and develop its $5 drug debt theory which would not have been otherwise supported by this witness's testimony. "Through its questioning of [the witness] the prosecution placed before the jury the content of patently inadmissible evidence. The purpose of the examination was not to refresh the witness' recollection, but rather to encourage the jury to draw inferences from these questions." State v. Liberatore
(1982), 69 Ohio St.2d 583, 588. Such tactics by the prosecution can constitute prejudicial error. Id. "It is error * * * for the court to permit counsel for the state, by continuing questioning, to get before the jury innuendoes and inferences of facts conditions and circumstances which the state could not get before the jury by direct testimony of witnesses." State v. Dinsio
(1964), 176 Ohio St. 460, syllabus.
It was thus clearly error for the trial court to permit the prosecution to lead Sneed as a hostile witness and to impeach him on the basis of prior statements, which the prosecution had previously ascertained Sneed would not adopt on the stand. The question remains whether such error was prejudicial to appellant in the context of the other evidence presented in the case. With respect to the allegation that the shooting occurred over a $5 drug debt, the prosecutor eventually understood and accepted Sneed's testimony that appellant had never made such a statement, and the prosecutor acknowledged his own confusion between Sneed and other witnesses on the matter. The prosecutor later elicited testimony from Shane Jenkins to the effect that appellant had stated that the victim owed appellant $5, and that appellant was angry because of the debt. In the totality of the evidence on this specific issue, the prosecution's placing the $5 drug debt issue before the jury by means of leading questions put to Tyrone Sneed is largely offset by the fact that this evidence eventually came in through questioning of Shane Jenkins.
With respect to the prosecution's introduction of Sneed's prior statement that appellant had declared explicitly that he had shot the victim, this is of course a substantially more damaging statement than the rather elliptical statement that appellant had "taken care of his business," as actually testified to by Sneed. The prosecution's case, however, did not rest disproportionally on this single piece of evidence regarding whether appellant had actually shot the victim. Steven Womack testified that appellant had specifically stated that he had killed someone. Shane Jenkins testified that appellant tacitly acknowledged the murder when asked about it, stating "You know the rest from there." Based on the totality of the evidence adduced at trial, we find that errors which occurred during the prosecution's examination of Tyrone Sneed were not prejudicial and therefore do not warrant reversal. Appellant's first and second assignments of error are accordingly overruled.
Appellant's third assignment of error asserts that the trial court erred in permitting evidence of other bad acts by appellant, specifically testimony to the effect that he was a drug dealer, in violation of Evid.R. 404(A)(1): "The bad character of an accused cannot be injected into a criminal case by the prosecution unless the accused first introduces evidence of good character." State v. Markowitz (1931), 138 Ohio St. 107, paragraph one of the syllabus. Pursuant to Evid.R. 404(B) relevant other acts evidence may be offered to prove motive, opportunity, intent, preparation, knowledge, identity or absence of mistake or accident. State v. Burson (1974), 38 Ohio St.2d 157. In the present case, the prosecution's theory of motive revolved in great part around the alleged relationship between appellant and the victim in the drug trade, and the resulting debt. Shane Jenkins testified that a bad transaction between appellant and the victim had led to appellant's anger. Steven Womack testified that appellant had told him in prison that the victim was a "runner" for appellant, and had funneled business to another crack dealer, leading to the shooting so that appellant could "send a message." Ron Cross testified that when he saw appellant in a car at the scene, seconds before the shooting, he recognized appellant as a person from whom he had previously bought drugs.
The above testimony was relevant because it substantiated the motive which the prosecution attributed to appellant. It "created a framework for considering whether appellant was motivated by revenge. * * * All of the testimony was admissible because it underpinned the prosecution's theory of appellant's motive and plan for the crime with which he was charged, and plainly it was not offered to demonstrate his propensity for criminal activity." State v. Hill (1987), 37 Ohio App.3d 72,74-75. Because the evidence of appellant's drug dealing was inextricably intertwined with the crime charged, we find that appellant has not demonstrated error in this respect, and appellant's third assignment of error is overruled.
Appellant's fourth and fifth assignments of error address the prosecution's alleged unconstitutional exercise of its peremptory challenges to eliminate a juror on the basis of race, in violation of Batson v. Kentucky (1986), 476 U.S. 79.
Under Batson, the state may not use its peremptory challenges, during the jury selection process, to exclude a member of the venire solely on the basis of race or gender. The burden to prove purposeful discrimination in exercise of the challenges is upon the accused. J.E.B. v. Alabama ex rel. T.B. (1994),511 U.S. 127. In order to make a prima facie case of purposeful discrimination, the appellant must demonstrate first that members of a cognizable racial group were peremptorily challenged, and second, that the facts and other relevant circumstances raise an inference that the prosecutor exercised the peremptory challenge to exclude jurors on account of race. State v. Hernandez (1992),63 Ohio St.3d 577, 582. If the prima facie case is shown, the burden then shifts to the prosecution to articulate a race-neutral explanation for the challenges. If such race-neutral reasons are offered, the burden shifts back to the defendant to establish that the reasons advanced by the prosecution are pretextual. Id. The trial court's finding of an absence of discriminatory intent on the part of the prosecution will not be reversed absent a finding that it was clearly erroneous. Id. at 583. A race-neutral explanation offered by the prosecution need not rise to the level of a challenge for a cause. State v. Cook (1992), 65 Ohio St.3d 516.
In the present case, the only black member of the jury venire was dismissed by the prosecution through use of a preemptory challenge, leaving the petit jury without a single black member. While Batson and its progeny typically address cases of multiple elimination of minority members from the venire, there is authority for the proposition that elimination of a single minority juror on account of race would constitute a Batson
violation. Turner v. Marshall (C.A.9, 1995), 1063 F.3d 807, 814;Hernandez v. New York (1991), 500 U.S. 352. Based upon the composition of the jury venire in this case, and the racial makeup of the petit jury which resulted from the selection process, we will proceed on the basis that appellant has established a prima facie case of discriminatory exercise of peremptory challenges in violation of Batson.
After the Batson violation was alleged by the defense, the prosecutor gave his reasons for striking the only black member of the venire. The prosecutor stated that the prospective juror had only an eighth grade education, was difficult to converse with, that the court reporter was having difficulty understanding the prospective juror's speech, and that as a result, the juror's ability to participate in jury deliberations was questionable. The defense counsel responded that a white member of the jury possessed the same moderate degree of education, but had not been challenged by the prosecution. Defense counsel did not address the prosecution's concern that the black juror's perceived speech deficit would interfere in his communication with other jurors. The trial court then ruled, after having observed the proceedings and hearing to the arguments of counsel, that she was satisfied that the prosecutor was not intentionally excluding the prospective juror on the basis of race, and that there was noBatson violation.
We are mindful that a reviewing court must grant due deference to the trial court's better situation from which to judge the prosecutor's credibility during a Batson challenge.Hernandez, supra.. While the present record evidences an unfortunate, but not statistically impossible, makeup of the jury venire, which gave a disproportionate impact to the prosecution's exercise of one of its peremptory challenges, we find nothing in the record which would compel us to disregard the trial court's determination based upon its observation of the jury's selection process. Appellant's fourth assignment of error is accordingly overruled.
Appellant's fifth assignment of error essentially asserts that, on its face, the presence of a single black member of a twenty-four member jury venire demonstrates that the petit jury could not have been drawn from a cross-section of the community. To establish a prima facie case of a unconstitutional jury cross section, appellant must first establish that the group alleged to be excluded is a distinctive group in the community, second, that the representation of this group in venires from which juries are selected is not fair or reasonable in relation to the proportion of such people in the community, and third, that the under-representation is due to a systematic exclusion of the group in the jury's election process. United States. v . Hill
(C.A.6, 1979), 146 Fed.3d 337-343, citing Duren v. Missouri
(1979), 439 U.S. 357.
Even if we are to accept the first two elements of Duren
as given, appellant has advanced absolutely no support for the third, that is, that the under-representation on appellant's venire was due to a systemic exclusion of blacks from the jury selection process, or that it diverged from the statutory selection process set forth in R.C. 2313.06 and 2313.08, which has been upheld by the Ohio Supreme Court. State v. Roe (1989),41 Ohio St.3d 18. Appellant's fifth assignment of error is accordingly overruled.
In accordance with the foregoing, appellant's first, second, third, fourth and fifth assignments of error are overruled, and the judgment of conviction and sentencing entered by the Franklin County Court of Common Pleas is accordingly affirmed.
Judgment affirmed.
BRYANT, J., and LAZARUS, PJ., concur.