The STATE of Ohio, Appellee,

v.

HALLEY, Appellant.

[Cite as *State v. Halley* (1994), 93 Ohio App.3d 71.]

Court of Appeals of Ohio,
Franklin County.

No. 93AP–825.

Decided Jan. 20, 1994.

Michael Miller, Franklin County Prosecuting Attorney, and Joyce S. Anderson, Assistant Prosecuting Attorney, for appellee.

Judith Stevenson, Franklin County Public Defender, and David Strait, Assistant Public Defender, for appellant.

WHITESIDE, Judge.

Defendant, David A. Halley, appeals his conviction by the Franklin County Court of Common Pleas on charges of kidnapping, rape, robbery and aggravated burglary. Defendant presents the following assignments of error:

"1. The trial court committed reversible error and deprived appellant of due process of law as guaranteed by the United States and Ohio Constitutions by permitting the introduction of prejudicial identification testimony derived from procedures that violated constitutional safeguards.

"2. Appellant was denied a fair trial and deprived of due process of law by the misconduct of the prosecutor during cross-examination of an alibi witness.

"3. The trial court committed reversible error and deprived appellant of due process of law by entering judgment of conviction against the manifest weight of the evidence and contrary to law."

On July 31, 1992, the Franklin County Grand Jury returned an indictment charging defendant with one count of kidnapping, two counts of rape, and one count of aggravated burglary. The matter was set for a jury trial. Prior to trial, defendant filed a motion to suppress testimony relating to the identification of defendant by the victim from a photo array. Defendant argued that the circumstances surrounding the photo identification were impermissibly suggestive, thus giving rise to a very substantial likelihood of irreparable misidentification. The motion came for hearing on January 5, 1993. Testimony was presented as to the methodology and circumstances surrounding the photo identification. The trial court, after considering the testimony presented, found proper identification procedures were followed in the presentation of the photo array, and there was nothing "impermissible, suggestive, misleading or leading in any form or fashion" in the photo identification process. The trial court overruled defendant's motion to suppress.

On January 6, 1993, this matter came before a jury for trial. The victim, testifying for the prosecution, stated that, on July 21, 1993, she first observed defendant as he exited the apartment next to hers and sat on the stairway behind her apartment door. The victim testified that she saw defendant for the second time the next evening, July 22, 1993. The victim was dropping by her apartment prior to attending class at a local college. Defendant was seated, with the door open, in the apartment next door. Defendant requested the victim come in and talk, but she refused, stating that she did not have time. The victim attended her class and, when she arrived home at approximately 10:30 p.m., defendant, who was again seated in the next door apartment with the door open, asked her to stay and talk. After dropping off her books in her own apartment, the victim entered the apartment next door to talk with defendant.

The victim testified that the two of them conversed for about thirty minutes. They talked about defendant's job at Wal–Mart, his "ex-wife," and that he was living at the apartment and was related to one of the other occupants. They also talked about cats. The victim stated that she had some cats, and the defendant requested to see them. They both got up and walked to the victim's apartment, where she requested defendant to stay outside. He disregarded her wishes, entered her apartment and locked the door behind him. A twenty-minute conversation ensued, after which defendant attacked the victim and raped her. After the attack, defendant demanded the victim shower and, when she finished, he left, stealing her money and wiping his fingerprints off items in the apartment.

In court, the victim identified the defendant as the man who raped her. She proceeded to testify as to how she contacted her parents after the rape, who then contacted the police. The police and the victim's parents arrived at her apartment, where she informed them as to what had occurred. The victim was taken to the hospital, where she underwent an exam, including various tests. The victim testified that she spent two to three hours at the hospital and then returned to her apartment for the police to continue their investigation. The victim was waiting in her parents' van outside the apartment when she saw a man exit the apartment next door. She testified that she screamed, "It's him, it's him," and the man turned and looked at her. The police chased the man but were unable to catch him. The victim testified that the man was wearing the same clothes he had worn prior to the attack. When the police returned, Detective Straight showed her a book of photographs and asked if she could identify anyone, but she could not. The police requested that she come down to police headquarters to examine another book of photographs. From this book, the victim identified a photo of defendant as her assailant.

Following the victim's testimony, the prosecution presented evidence corroborating her story. Dr. Raymond Harrison testified that he examined the victim following the attack and noted some tenderness along her left collarbone and some bruising in the back. There was also tenderness just above her pubic region. The doctor testified that vaginal swabs were taken during the exam.

The swabs and the victim's underwear were submitted to a Columbus Police Department criminalist, who analyzed the evidence, finding semen present on one of the swabs. She testified that DNA testing was performed, but only the victim's DNA pattern was identifiable. She further testified that she also examined a pair of men's underwear, earlier identified as defendant's, upon which she found seminal stains. Detective Straight, Detective Harris and Detective Weeks of the Columbus Police Department testified as to their investigation of the case. Detective Harris testified that the victim had described the perpetrator as a "male white, the age of 23, height five-foot-six to five-foot-ten in height,

weight 140 to 170 pounds, hair color would be brown and eye color would also be brown." The victim also told Detective Harris that the rapist's name was David.

Detective Weeks testified on cross-examination that three fingerprint lifts were taken, two of which were of value. Neither of the fingerprints matched those of the defendant.

After the state rested, the defense made a Crim.R. 29 motion for acquittal on all counts, which the trial court denied. The defense presented witnesses, including the defendant's wife, Lori Halley. Ms. Halley testified that she was with defendant the evening of July 22, 1993. She testified that she and the defendant spent the night in the apartment and that David had been staying in the apartment at Bramblewood Court. She further testified that she and defendant left the apartment at 6 a.m. and that she dropped defendant off at the bank on Georgesville Road. At the beginning of cross-examination, the prosecutor asked Ms. Halley if anyone had explained the charge of perjury to her. Defense counsel objected.

The defendant testified on his own behalf. His testimony corroborated that of his wife. Defendant denied raping the victim.

On rebuttal, the prosecutor called George Enterman to the stand. He testified that Lori Halley had made a statement that she was willing to lie for defendant about where she and defendant had been the night in question. The prosecution also presented the testimony of Detective Weeks, who stated that he was outside the scene of the crime until 7 a.m. the morning of July 23, 1993.

Detective Weeks testified that, after the victim spotted the perpetrator exit the apartment next door, he (Weeks) entered the apartment but found it empty. The state recalled the victim and, after she testified, the matter was submitted to the jury.

The jury found defendant guilty on all counts of the indictment. The trial court imposed a sentence of ten to twenty-five years on the rape, kidnapping and aggravated burglary counts, to be served concurrently with each other but consecutively to a three-to-fifteen-year sentence on the robbery count. From this judgment, defendant filed a timely appeal.

Defendant argues that the trial court erred in admitting testimony concerning the victim's identification of defendant from a photo array. Defendant asserts that the state failed to present the trial court with a full account of the totality of the circumstances surrounding the identification; in particular, the state did not offer into evidence the "photo album" shown to the victim by Detective Straight, from which no identification was made. Defendant contends that the state's failure to produce the "photo album" prevented the trial court from fully evaluating the suggestiveness of the entire photo procedure. The record reflects

neither the reason for the state's failure to produce the "photo album," nor an objection by the defense because it was not produced.

Generally, identification testimony is admissible unless, given the totality of the circumstances, the identification is so unreliable that there exists a substantial likelihood of irreparable misidentification. See *Manson v. Brathwaite* (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140. As noted in *Manson* at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154:

"[R]eliability is the linchpin in determining the admissibility of identification testimony * * *. The factors to be considered are set out in [*Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) ]. 409 U.S., at 199–200 [93 S.Ct., at 382, 34 L.Ed.2d at 411]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."

The threshold question is whether the photo identification is impermissibly suggestive. All identification processes are inherently suggestive. Due process is violated only when the process is so impermissibly suggestive that the identification is unreliable in that there exists a substantial likelihood of irreparable misidentification.

In the present matter, the victim was presented at the police station with a photo array of fifty-five individuals generally matching the description the victim gave of her assailant. Defendant's photograph was contained in this array. The victim had previously been shown a "photo album" in her parents' van, but the record reveals that defendant's photograph was not among those shown to the victim in the "photo album." The victim was unable to identify her assailant from the photos contained in this album.

■ The first "photo album" was not produced in the suppression hearing; therefore, the court could not evaluate its "suggestiveness." It is difficult to fathom how this collection of photos could be so impermissibly suggestive as to taint the entire identification process, since the victim was unable to identify her assailant from any of the photographs, and defendant's photograph was not included.

■ However, even assuming the original "photo album" somehow could render the identification process impermissibly suggestive, defendant's constitutional rights were not violated by the trial court's admission of the identification testimony. If an identification is found to be impermissibly suggestive, the court must weigh the factors set forth in *Manson* against the "corrupting effect of the

suggestive identification itself." *Manson.* The court must determine whether the victim's identification was otherwise reliable.

An application of the factors as set forth in *Manson* reveals the identification of defendant's photo as that of the attacker took place approximately ten hours after the attack. In addition, the victim had the opportunity to view and converse with defendant twice prior to the events leading up to the attack. Immediately preceding the attack, the victim conversed with defendant for almost an hour in well-lit rooms. Following the attack, the victim observed defendant again as he ran from the apartment, and she screamed, "It's him, it's him." The victim's description of her attacker included an accurate description of his clothing, his given name, and his physical appearance, including the gap in his front teeth. The victim was positive in her identification when she chose defendant's photograph from fifty-five photos of males with similar characteristics.

Weighing the factors set forth in *Manson* against an (assumed) impermissibly suggestive identification process supports a finding that the victim's identification was reliable. Furthermore, a review of the totality of the circumstances of this case reveals no substantial likelihood of irreparable misidentification. The record revealed the victim had numerous opportunities to see and speak with her attacker. The evidence establishes that defendant was the only male staying at the apartment at the time surrounding the attack. Defendant was found the next day in the same clothes the victim described her attacker as wearing. The defense's allegations that the attacker was one Glen Nicodemus was refuted by both the victim and Glen Nicodemus himself. In fact, the defense's primary alibi witness, Lori Halley, corroborated the victim's testimony to the extent that she testified that no one else was at the apartment next door to the victim's apartment but defendant and her. If defendant was the only male in the apartment on the early morning following the attack, only defendant could have exited the back door and have been seen by the victim. The totality of the circumstances in this matter does not raise a substantial likelihood of misidentification, much less irreparable misidentification. Based on the foregoing, defendant's first assignment of error is without merit.

Defendant's second assignment of error alleges that he was "denied a fair trial and deprived of due process of law by the misconduct of the prosecutor during cross-examination of the alibi witness," Lori Halley, which was transcribed in pertinent part, as follows:

"Q. [THE PROSECUTOR] DID ANYONE EVER EXPLAIN THE CHARGE OF PERJURY TO YOU?

"A. [LORI HALLEY] YES, THEY HAVE.

"[DEFENSE COUNSEL] MR. PUSATERI: OBJECT.

"THE COURT: LET'S DO A SIDE BAR.

"THEREUPON, COURT AND COUNSEL CONFERRED IN THE ANTE ROOM OUT OF THE HEARING OF THE JURY AND THE FOLLOWING PROCEEDINGS WERE HELD:

"THE COURT: OFF THE RECORD.

"THEREUPON, AN OFF–THE–RECORD DISCUSSION WAS HELD.

"* * *

"MR. PUSATERI: ARE YOU A WITNESS NOW?

"MR. VANDERKARR: NO.

"MR. PUSATERI: BECAUSE I WILL NOT LET YOU TESTIFY FROM UP THERE.

"MR. VANDERKARR: I DON'T NEED TO.

"THE COURT: WE WILL PUT THE JURY IN THE BACK AND EXPLAIN PERJURY TO HER AND DO IT OUT OF THE PRESENCE OF THE JURY. LET'S DO THAT.

"MR. PUSATERI: NO, I DON'T WANT TO PUT THEM BACK THERE AFTER THAT QUESTION. COME ON, GIVE ME A BREAK.

"THE COURT: DID YOU WANT TO EXPLAIN IT TO HER IN FRONT OF THE JURY? IF HE SAYS HE HAS GOT A WITNESS LIKE HE SAYS, I THINK SHE HAS A—HE HAS A RIGHT TO QUESTION HER ON THAT.

"MR. PUSATERI: I WOULD RATHER HAVE IT DONE IN FRONT OF THE JURY, AS LONG AS YOU ARE NOT GOING TO TESTIFY.

"MR. VANDERKARR: NO, I AM NOT GOING TO TESTIFY.

"THEREUPON, COURT AND COUNSEL RETURNED INTO THE COURTROOM AND THE FOLLOWING PROCEEDINGS WERE HELD IN THE PRESENCE AND HEARING OF THE JURY:

"Q. (BY MR. VANDERKARR) I BELIEVE YOUR ANSWER WAS, YOU DO UNDERSTAND PERJURY?

"A. YES, I DO.

"Q. DO YOU UNDERSTAND THAT IF YOU DON'T TELL THE TRUTH UNDER OATH HERE TODAY, YOU CAN BE CHARGED WITH A FELONY?

"A. YES, I DO.

"Q. AND YOU STILL STAND ON WHAT YOU HAVE TESTIFIED TO SO FAR?

"A. YES, I DO."

Ordinarily, accusations or reminders of perjury by a prosecutor are improper. Such statements function as backhanded impeachment as well as attempted witness intimidation and express the prosecutor's personal belief or opinion as to the credibility of the witness, which is improper. See *State v. Thayer* (1931), 124 Ohio St. 1, 176 N.E. 656; *State v. Smith* (1984), 14 Ohio St.3d 13, 14 OBR 317, 470 N.E.2d 883; and DR 7–106(C)(4) of the Code of Professional Responsibility. Due to the prosecutor's role as representative of the state, it is important to avoid any such impropriety so that the stature of the office of the prosecuting attorney does not lend credence or distrust to the testimony of either party's witnesses. Even if the prosecutor is aware of a witness's falsity, unless the prosecutor chooses to testify, it is improper to imply the witness is a perjurer. A correct method of impeachment would be the presentation of a rebuttal witness and, during closing arguments, drawing the jury's attention to the inconsistency in the testimony. The jury may then perform its rightful function and determine credibility.

 The prosecutor's statement was also an attempt to intimidate the witness. Intimidation of a witness by accusations or insinuations of perjury is improper if done by either the court or the prosecutor. While it may not be improper for the court or even a prosecutor to warn a witness of the penalties of perjury and his right against self-incrimination out of the hearing of the jury, it should ordinarily not be done in the presence of the jury. Furthermore, when the warning reaches the level of intimidation and interferes with a defendant's right to present witnesses, reversible error occurs. See *Webb v. Texas* (1972), 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330; *State v. Dumaine* (1989), 162 Ariz. 392, 783 P.2d 1184.

 In this matter, the transcript reveals no indication that the witness was intimidated by the prosecutor's improper statement. She stood by her testimony despite the prosecutor's efforts. The defendant has not shown the prosecutor's misconduct had any effect on Lori Halley's testimony, or on the outcome of the trial. Defendant was not deprived of his right to compulsory process, nor due process.

 The trial court erred by not sustaining the defendant's objection to the prosecutor's query. The proper course would have been to sustain the objection and issue a curative instruction to the jury. However, the trial court's failure to sustain the objection and give a curative instruction does not require reversal, since no prejudice has been demonstrated.

Since the trial court permitted the improper questioning, such a request would probably have been futile. In any event, a curative instruction was not given.

However, the error was not prejudicial, as it is clear beyond any reasonable doubt that, absent the prosecutor's comments, the jury would have found defendant guilty. *Smith, supra,* citing *United States v. Hasting* (1983), 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96.

Defendant's own witnesses placed defendant in the apartment next to the victim's apartment. Detective Weeks testified that he searched the apartment that Lori Halley claims to have stayed in and found it empty shortly after the victim saw defendant exit the back door. The victim clearly identified defendant as the man who raped her in the early morning hours following the crime and in court during trial. Defendant's physical appearance and the clothes he was found in at the time of arrest conformed to the description the victim gave of her attacker. The evidence of defendant's guilt was overwhelming, irrespective of the prosecutor's improper question during cross-examination.

Based on the foregoing, defendant's second assignment of error is not well taken.

■ Finally, defendant argues that the judgment was against the manifest weight of the evidence. Construing the evidence (as outlined above) most strongly in favor of the state, there is sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. See *State v. Eskridge* (1988), 38 Ohio St.3d 56, 526 N.E.2d 304; *Elyria v. Tress* (1991), 73 Ohio App.3d 5, 595 N.E.2d 1031. Defendant's third assignment of error is not well taken.

For the foregoing reasons, all three of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

TYACK and CLOSE, JJ., concur.