JOURNAL ENTRY AND OPINION
Defendant-appellant Anthony E. Johnson (d.o.b. July 14, 1970) appeals from his convictions and sentences involving four cases. See Cuyahoga County Common Pleas Court, General Division, Case Nos. CR-397780, CR-399616, CR-400550, and CR-401332. For the reasons adduced below, we affirm in part, and reverse and remand in part for resentencing.
A review of the record on appeal indicates that appellant had four cases which were consolidated and tried to the bench. See Cuyahoga County Common Pleas Court, General Division, Case Nos. CR-397780, CR-398577[1], CR-399616, and CR-400550. Case CR-397780 originally involved three counts of aggravated robbery and three counts of kidnapping; the three female victims are hereinafter referred to as SB, HP, and BC. Case CR-398577 (which is not the subject of appellant's notice of appeal) originally involved one count of possession of drugs by appellant. Case CR-399616 originally involved one count each of aggravated robbery, attempted rape, kidnapping, gross sexual imposition, and receiving stolen property; the lone female victim is hereinafter referred to as MG. Case CR-400550 originally involved one count each of aggravated robbery and kidnapping; the two female victims are hereinafter referred to as BB and RS. During the course of the trial, the defense offered no witnesses in its case-in-chief.
After the court returned guilty verdicts in the three cases summarizedinfra, appellant pled guilty in two other cases. See Cuyahoga County Common Pleas Court, General Division, Case Nos. CR-397908 (involving one count of possession of drugs, which is not the subject of appellant's notice of appeal) and CR-401332 (involving a guilty plea to one count of escape for not having reported to his probation officer, and which was entered after closing argument and is one of the orders appealed from in appellant's notice of appeal).
Thus, the only convictions and sentences which are the subject of appellant's notice of appeal are those which relate to the non-drug cases. In order to assist the reader in better understanding the issues, the evidence surrounding each of the relevant cases appealed from and which were not the subject of a guilty plea will be set forth separately, in the chronological order of the underlying offenses.
 CR-400550
The offenses in this case occurred at approximately 6:30 to 7:00 p.m. on September 15, 2000 at the St. Maron Church parking garage located near East 12th Street and Carnegie Avenue in downtown Cleveland. Both of the female victims testified on behalf of the state.
BM testified she and her co-worker friend, co-victim RS, had just eaten at a birthday dinner for BB and were going to BB's car, a Ford Focus coupe. It was still light out. After BB had placed some of her birthday balloons inside the rear passenger seat area of the car, and RS was standing beside the passenger side of the car, BB stood up and turned to find RS standing with a man with a green jacket. The man was holding RS with his arm around her throat holding a knife. As BB walked toward the rear of the car, she told the man that they did not have any money. BB then spotted another man out of the corner of her eye. BB began to scream and run; the other man chased her. As BB reached the Carnegie entrance to the parking garage, she heard the green-jacketed man say to his accomplice, "We got the money. Let's go, man." Tr. 111. BB then fell at the entrance to the garage. BB did not see where the two assailants went, but she then returned to her car where she found RS alone inside the car. They then went to the police and made a report. Approximately ten days after the attack, BB observed a photographic array at the police station. See State Exhibit 1. BB, focusing on the suspect's eyes and hair, picked out photo number 2 as the green-jacketed, knife-wielding assailant, after only seconds of viewing the array, and identified appellant in court as that assailant who was depicted in photo number 2. Tr. 114-117, 136, 139-142, 144, 146-147.
RS, testifying for the state, generally corroborated the version of events testified to by BB. In addition, RS testified to more information. RS stated that the person that grabbed her from behind demanded that she surrender her purse. She did not get a good look at this man, but did note that he was an African-American male who wore a green windbreaker made with a rubber-type material and he pointed a knife at her throat. RS observed the other man, wearing a yellow polo shirt, advance on BB as BB started to scream and run away. The man holding RS loosened his grip and then removed the backpack purse RS was wearing over her left shoulder. RS stated that the purse contained, in part, her checkbook, credit cards, loose change, and $540 in currency which was from her cashing her payroll check. After taking the backpack, the man swung it and called to the other man that "he had it." Tr. 153. At that point, the assailants ran away. Her backpack purse, minus her money, was recovered in a nearby alley later that evening. RS was unable to identify her assailant when shown a photographic array. At the police station, RS stated on cross-examination that she perused and identified a green windbreaker, a photograph of which was admitted as State Exhibit 9, as the windbreaker which her assailant had worn. Tr. 160-161, 169.
 CR-399616
The offenses in this case occurred at 3:00 p.m. on October 3, 2000 in the parking lot of the Value City Department Store located at Tiedeman and Brookpark Roads in the City of Parma.
The victim, MG, who was then a cashier at the store, had arrived early for work. The weather was clear. Her purse, which contained $40, credit cards, identification, and some other items, was on the passenger seat of her car, a 1994 Chevrolet Cavalier coupe. After she parked her car in an available space, she opened her car door and, before she could exit the vehicle, was immediately attacked by a man who pushed her against her seat, touched her breasts as he leaned over her, and said that he was going to rape her. The man was half in and half out of her car. She screamed. The man then ordered her to "shut up" and told her that he had a gun. She never saw the gun, but she believed his statement of being armed. The man then saw her purse and grabbed it. In the process, he also grabbed near her "crotch area," Tr. 210, but did not actually touch the crotch area. See Tr. 238. She testified that at that point her liberty was restrained and she could not get away. Tr. 215. She unsuccessfully tried to push him off her. Tr. 239. After grabbing the purse, the man fondled her breasts from outside her clothing, then began to run away. The victim ran after him. After some distance, the man got into a parked car, identified by the victim as a dark-blue Buick Century, and attempted to shut the door. The victim was at the car door, struggling to get her property back and preventing, for a time, the door from closing. As she repeatedly struck him in the face and with the door still open, the man put the car in reverse, and started to drive away in the direction of Brookpark Road with the victim still reaching inside the car with one hand for her purse as she held onto the man with the other hand. The victim slid off the car, incurring some abrasions to her person, and heard the man's car strike a few cars as it sped away. The victim stated that she identified the appellant from a series of six or seven photographs shown to her by the police later at her home. Tr. 230. At a live line-up conducted approximately one week after the attack, the victim identified the appellant as her attacker. Tr. 234-235. The victim, based on her memory of the assailant and not on any other suggestion by the police or prosecutors, also identified the appellant in court as her assailant. Tr. 233, 237-238. She also testified on cross-examination that she was nearsighted, had trouble with distances, and was not wearing her glasses at the time of her attack. Tr. 219. She did not identify the appellant merely because the authorities told her she had to identify him. Tr. 239.
 CR-397780
The offenses in this case occurred at 2:30 p.m. on October 9, 2000.
Victim SB testified that she and the two other victims (HP and BC) had just left class at The Academy of Court Reporting located in The Rockefeller Building on West 6th Street in downtown Cleveland and were going to HP's car, a four-door Ford Escort, which was parked in a nearby alley. As the ladies were looking for a lost hamster which HP believed was still in the car from that morning, a man came up behind SB, who was at the rear passenger door, bumped her and told her to get into the car. At first, SB did not obey, but changed her mind when the man displayed a kitchen butcher knife from his windbreaker jacket. SB identified the windbreaker shown in State Exhibit 10 as the appellant's windbreaker that she observed at the time of the offense. Tr. 247-248. The other victims and the appellant all got into the car; HP was driving. SB sat beside the appellant in the rear seat while BC sat in the front passenger seat.
While inside the car which was heading to the "projects," located in the vicinity of Cedar Avenue and East 30th Street in Cleveland which is where the appellant instructed HP to drive toward, the appellant instructed BC to hand over her purse to him; BC complied. Appellant then instructed SB to get the wallet out of BC's purse; SB found the wallet and approximately $3.00 which was inside and which was then taken by appellant. Appellant then searched SB's purse and took approximately $200 which was inside.
While the car was heading toward the "projects," the appellant also bragged that he had been the subject of reporting on the front-page of the local daily newspaper.
When the car reached the "projects," appellant exited the car and departed, telling the victims to have a nice day as he left. The victims then drove back to the school, where the police were summoned.
SB viewed a photographic array at the Third District, but was unable to identify a suspect. Tr. 255. The day after the robbery, SB viewed an in-person line-up of approximately eight suspects at police headquarters, at which time she identified the appellant. Tr. 256. SB also identified the appellant in court. Tr. 256-258.
Victims BC and HP generally corroborated the testimony of SB.
BC added that appellant threatened to kill all of them. Tr. 274. BC also stated that the man who attacked them was very dark-skinned, that he locked the car doors when all were inside, and that she looked at the appellant's face in the rear-view mirror from time-to-time while the car was being driven. BC next stated that she had approximately $600 to $800 in cash in her purse, but that appellant only found, and took, approximately $2.50 which was in the change section of her wallet. BC identified a green hat with a polo emblem, see State Exhibit 8, as the hat which appellant wore during the robbery. Tr. 278. BC also identified the windbreaker depicted in State Exhibit 10 as the same windbreaker which appellant wore during the robbery. Tr. 279-280.
BC, on the day of the robbery and while separated from the other victims, identified the appellant (as depicted in photograph number 2) from a photographic array at the police station. Tr. 282, 285. BC also identified the appellant in court as her attacker, see Tr. 282-284, and during a line-up at the police station. See Tr. 296-297.
Victim HP added that she repeatedly observed the appellant in the rear-view mirror during the robbery. HP also identified the windbreaker in evidence as the windbreaker worn by appellant during the robbery. HP also testified that appellant wore a green hat with a polo emblem during the robbery, and identified State Exhibit 8 as that hat. HP stated that appellant took $6.00 from her which she had kept in her pocket. HP identified the appellant in court as her robber. Tr. 310, 315, 323. HP, while separated from BC, identified appellant as photograph number 2 in a photographic array shown to her at the police station on the day of the robbery. Tr. 312, see State Exhibit 1 (photograph array used by the police with appellant at photograph number 2). HP was with the police after the robbery, touring the projects area looking for the attacker, when the police located the abandoned windbreaker and hat, which HP, at the time, identified as having belonged to the robber. Tr. 313-314, see State Exhibit 16 (photograph of the windbreaker and hat as it was found by the police laying on the ground near some brush beside a doorway, which was identified by HP at the scene and at trial). HP, a day or so after the robbery and without the presence of her co-victims in the line-up viewing room, identified appellant from a line-up at police headquarters. Tr. 314-315, 322.
At the close of the state's case, the trial court granted a motion for acquittal on the following: (1) in CR-400550, acquittal on one count each of aggravated robbery (count 1) and kidnapping (count 3) involving BB; and, (2) in CR-399616, acquittal on all firearm specifications.
On the remainder of the charges, the court found appellant guilty of the following:
 (A) in CR-397780, kidnapping of SB (count 1), kidnapping of BC (count 3), and three counts of aggravated robbery (counts 4, 5, and 6, representing one count for each of the three victims);
 (B) in CR-398577, one count of possession of drugs;
 (C) in CR-399616, robbery of MG (count 1), kidnapping of MG (count 3), gross sexual imposition involving MG (count 4), receiving stolen property motor vehicle (count 5);
 (D) in CR-400550, aggravated robbery of RS (count 2) with notice of prior conviction, see R.C. 2929.13(F)(6), and repeat violent offender, see R.C. 2929.01, specifications, and kidnapping of RS (count 4) with notice of prior conviction, see R.C. 2929.13(F)(6), and repeat violent offender, see R.C. 2929.01, specifications;
(E) in CR-401332, one count of escape.
The court sentenced appellant on May 23, 2001 to a total of 27 years imprisonment, as follows:
 (A) in CR-397780, 9 years each on counts 1, 3, 4, 5, and 6, to run concurrent with each other and consecutive to the sentences in CR-400550 and CR-399616;
 (B) in CR-398577, 9 months to be served concurrently with the sentences in CR-400550, CR-399616, and CR-397780;
 (C) in CR-399616, 9 years each on counts 1 and 3, 1 year each on counts 4 and 5, sentences to be concurrent with each other and consecutive to the sentences in CR-400550 and CR-397780;
 (D) in CR-400550, 9 years each on counts 2 and 4, to be concurrent with each other, and consecutive to the sentences in CR-399616 and CR-399780;
 (E) in CR-401332, 3 years to run concurrently with the sentences in CR-399616 and CR-400550.
Appellant, represented by the public defender, filed his timely notice of appeal from convictions and sentences entered in CR-397780, CR-399616, CR-400550, and CR-401332, on June 19, 2001. Four assignments of error, which will be addressed seriatim, are presented for review.
The first assignment of error provides:
 1. MR. JOHNSON WAS DENIED DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10, OF THE OHIO CONSTITUTION WHEN SUGGESTIVE IDENTIFICATION PROCEDURES WERE EMPLOYED BY THE POLICE.
In this assignment, appellant argues that all of the identifications gleaned from photographic arrays and line-ups were tainted because each identification procedure had appellant, or his likeness, in it; not one of the arrays or line-ups had appellant, or his likeness, absent from the procedure. It is argued that this out-of-court pretrial police procedure was unnecessarily suggestive in that it singled out the appellant, and thereby tainted the in-court identification of the appellant due to a likelihood of misidentification. Appellant argues that the trial court should have granted his pretrial motion to suppress this pretrial identification.
Our review of this identification issue is guided by the following:
 The issue then for our review is whether the trial court properly admitted the identification evidence in this case.
 In State v. Thompson (1998) 127 Ohio App.3d 511, 713 N.E.2d 456, the court stated:
 The defendant has the burden to show the court that the identification procedures were unnecessarily suggestive. (Citation omitted.)
 In State v. Halley (1994) 93 Ohio App.3d 71, 76, 637 N.E.2d 937, 940, the court stated:
 The threshold question is whether the photo identification is impermissibly suggestive. All identification processes are inherently suggestive. Due process is violated only when the process is so impermissibly suggestive that the identification is unreliable in that there exists a substantial likelihood of irreparable misidentification.
State v. Mays (Sept. 13, 2001), Cuyahoga App. No. 78619, unreported, 2001 Ohio App. LEXIS 4078 at 8.
The factors to be utilized in determining the likelihood of misidentification under the totality of the circumstances, whether the identification was reliable even though the confrontation procedure was suggestive, include the following:
 * * * the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Neil v. Biggers (1972), 409 U.S. 188, 199-200, 93 S.Ct. 375, 382,34 L.Ed.2d 401, 411, 1972 U.S. LEXIS 6; State v. Smith (1998),130 Ohio App.3d 360, 372.
The record indicates that the police detectives had obtained the appellant's identity through investigation. Once obtained, the detectives prepared a six-photo array consisting of a manila folder with six small square holes of relatively equal size cut out of it and the photographs, full face shots from the neck up and of approximately equal size, of six suspects inserted individually into the holes. Directly above each photograph was a small circle with a number, from 1 to 6, in it; no number was used twice. Appellant's photograph was marked as photograph number 2. Photographs 1, 2, and 3 depict dark-skinned African-American males with closely cropped hair and wide noses. Photographs 4, 5, and 6 depict light-skinned African-American males with closely cropped hair and wide noses. The persons in photographs 2 and 3 resemble one another. The ages of the suspects in the photographs appear to be reasonably similar. It was this array which was shown to each of the individual victims and marked as State Exhibit 1. When shown to the victims, the victim viewing the array was physically separated from any other victim so as minimize any risk of influencing the viewing selection process.
The line-up was conducted with similar protections in place to minimize the risk of influencing the viewers. First, the suspects selected to be in the line-up were of similar race, build, age, height, and skin color. See State Exhibit 3 (a color photograph showing the group of suspects, shown in full height, who were in the line-up). Second, each victim who viewed the line-up did so outside the presence of any other victim, while the victims who had yet to view the line-up were physically separated in another room from the victim being shown the line-up. Third, following each viewing, each victim was then led away to another room and not returned to the room with the victims who had yet to view the line-up.
The victims had ample opportunity to view the appellant's face during the robberies. The victims' prior description of the appellant to the police was relatively similar. The victims' level of certainty about picking the appellant as their attacker was uniformly high. The length of time between the crimes and the identification procedureswas short, from as little as a few hours, to a day or two, to at most a few weeks depending on the victim. Finally, each victim who testified at trial identified the appellant, unequivocally and without hesitation, as the person who had committed the crimes herein. Thus, even if we were to conclude that the photo array and line-up were suggestive, taking into consideration the totality of the circumstances in this case, we cannot say that appellant's identification was unreliable.
The first assignment of error is overruled.
The second assignment of error provides:
 2. APPELLANT JOHNSON'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10, TO THE OHIO CONSTITUTION.
With regard to a sufficiency of the evidence argument, the Ohio Supreme Court stated the following:
 In reviewing a record for sufficiency, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." DeHass, 10 Ohio St.2d 230, 39 Ohio Op. 2d 366, 227 N.E.2d 212, paragraph one of the syllabus.
State v. Nields (2001), 93 Ohio St.3d 6, 24, 752 N.E.2d 859, 884; also see State v. Treesh (2001), 90 Ohio St.3d 460, 484, 739 N.E.2d 749; Statev. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212; State v. Love (Jan. 10, 2002), Cuyahoga App. No. 78850, unreported, 2002 Ohio App. LEXIS 66 at 21-22.
Appellant's brief lays out the pertinent legal review standard for a general sufficiency of the evidence issue. Then, instead of separately stating his argument with accompanying citations to appropriate authorities, statutes, and the record, as is required by App.R. 16(A)(7), appellant's argument with respect to this assignment perfunctorily references this court to his motions for acquittal presented at the trial, stating:
 "Here, as argued below, and upon the same basis stated by defense counsel in his motions for acquittal under Crim.R. 29, viewing the evidence in a light most favorable to the State, the prosecution failed to prove each and every element of Mr. Johnson's convictions beyond a reasonable doubt."
Appellant's brief at 10.
This court recently determined that a defectively presented argument vis-a-vis App.R. 16(A)(7) prevents an appellate court from considering an assignment of error. See State v. Clayton (Nov. 15, 2001), Cuyahoga App. No. 78922, unreported, 2001 Ohio App. LEXIS 5087 at 16, citing NorthCoast Cookies, Inc. v. Sweet Temptations, Inc. (Cuyahoga, 1984),16 Ohio App.3d 342, 344, 476 N.E.2d 388, and App.R. 12(A)(1)(b).
In the alternative, after considering the evidence supporting these assorted convictions in a light most favorable to the prosecution, the court could have found the elements of the crimes proven beyond a reasonable doubt. Thus, the trial court did not err in denying the motion for acquittal.
The second assignment of error is overruled.
The third assignment of error provides:
 3. THE CONVICTIONS AGAINST MR. JOHNSON WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THERE WAS NO SUBSTANTIAL EVIDENCE UPON WHICH A TRIER OF FACT COULD REASONABLY CONCLUDE THAT THE ELEMENTS HAD BEEN PROVEN BEYOND A REASONABLE DOUBT.
The standard of review for an argument concerning the manifest weight of the evidence supporting a criminal conviction was recently stated by this court, as follows:
 In State v. Thompkins (1997), 78 Ohio St.3d 380 at 386, 678 N.E.2d 541, the Ohio Supreme Court indicated the correct test to be utilized when addressing the issue of manifest weight of the evidence was set forth in State v. Martin (1983), 20 Ohio App.3d 172, 485 N.E.2d 717, as follows:
 There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * * See Tibbs v. Florida (1982), 457 U.S. 31, 38, 42, 72 L.Ed.2d 652, 102 S.Ct. 2211. (Emphasis added.)
 It is axiomatic, however, that the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1. (Emphasis in the original.)
State v. Taylor (Jan. 10, 2002), Cuyahoga App. No. 79274, unreported, 2002 Ohio App. LEXIS 75 at 18-19.
The appellant's briefing of this assignment is structured the same as the second assignment, supra. Appellant presents the general standard of review, with applicable case citations, for an assignment involving the manifest weight of the evidence. Then, without presenting any argument with relevant citations to the record and authority, appellant states the following as he closes the briefing on his third assignment of error:
 The combined weight of the evidence in synergy with the suggestive identification procedures employed by the police suggests that the fact finder clearly lost its way in this case. Accordingly, the guilty verdicts must be reversed and the matter remanded for a new trial.
Appellant's brief at 12.
This cursory, two-sentence summation statement by appellant does not comply with a properly presented argument under App.R. 16(A)(7). Accordingly, the court is justified in disregarding the assignment of error. See Clayton, supra, and North Coast Cookies, Inc., supra.
In the alternative, there was substantial evidence presented upon which the trial court could reasonably conclude that the elements of the offenses had been proven beyond a reasonable doubt.
The third assignment of error is overruled.
The fourth, and final, assignment of error provides:
 4. THE TRIAL COURT ERRED BY ORDERING CONSECUTIVE SENTENCES WHEN IT FAILED TO MAKE THE NECESSARY FINDINGS AND REASONS FOR THE FINDINGS REQUIRED BY R.C. 2929.14(E)(4).
In this assignment, appellant attacks the imposition of consecutive sentences in cases CR-397780, CR-399616, and CR-400550 due to the trial court's alleged failure to adhere to the findings and reasons requirements contained in R.C. 2929.14(E)(4) and 2929.19(B)(2)(c).
The standard of review for the imposition of consecutive sentences for multiple offenses was recently discussed at some length by this court, as follows:
 Pursuant to R.C. 2929.14(E)(4), the trial court may impose consecutive prison terms for convictions of multiple offenses upon the making of certain findings enumerated in the statute. Specifically, R.C. 2929.14(E)(4) provides in pertinent part:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
 Under R.C. 2929.19(B)(2)(c), if the trial court imposes consecutive sentences, it must make a finding on the record that gives its reason for imposing consecutive sentences. State v. Nichols,
2000 Ohio App. LEXIS 767 (Mar. 2, 2000) Cuyahoga App. No. 75605, 75606, unreported; State v. Parker,
1999 Ohio App. LEXIS 5913 (Dec. 9, 1999) Cuyahoga App. Nos. 75117, 75118, unreported; State v. Cardona, 1999 Ohio App. LEXIS 6064 (Dec. 16, 1999) Cuyahoga App. No. 75556, unreported. The record must confirm that the trial court's decision-making process included all of the statutorily required sentencing considerations. See Cardona, supra; Nichols, 2000 Ohio App. LEXIS 767, supra, citing State v. Edmonson (1999), 86 Ohio St.3d 324, 715 N.E.2d 131. The trial court need not use the exact words of the statute, however, it must be clear from the record that the trial court made the required findings. State v. Garrett, 1999 Ohio App. LEXIS 4083 (Sept. 2, 1999) Cuyahoga App. No. 74759, unreported.
State v. Ponius (Dec. 13, 2001), Cuyahoga App. No. 79333, unreported, 2001 Ohio App. LEXIS 5507 at 2-4; also see State v. Gary (Cuyahoga, 2001), 141 Ohio App.3d 194.
Thus, in a nutshell, the record of a multiple felony case must demonstrate the following findings by the trial court, and reasons for those findings, for the imposition of consecutive sentences:
 * * * that the sentence is (1) necessary to protect the public from future crime or to punish the offender; (2) not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) the court finds one of the following: (a) the crimes were committed while awaiting trial or sentencing, under sanction or under post release control; (b) the harm caused by multiple offenses was so great or unusual that a single prison term would not adequately reflect the seriousness of his offense; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime. R.C. 2929.14(E)(4). (Emphasis added.)
Gary, 141 Ohio App.3d at 196.
At the sentencing hearing herein, appellant's counsel asked for leniency and placed the blame for appellant's criminal shortcomings on a history of drug usage by appellant and the lack of "influential guidance" throughout appellant's life. Tr. 418. The appellant addressed the court at sentencing and professed his innocence of the charges, claiming that he was a scapegoat. Tr. 419-420. The trial court, after having reviewed the presentence investigation report, hearing from the defense, and having heard oral statements by victims MG, RS, BB, stated the following relevant passages:
 These are Senate Bill 2 cases, and under Senate Bill 2, the Court has to consider a variety of sentencing factors in order to determine an appropriate sentence. And it should be noted for the record first of all that there are six cases involved. Mr. Johnson was a one-man crime spree from being placed on post-release control in July until he was finally apprehended sometime I believe in October. So that he was already on post-release control when these offenses were committed. He's got an extensive prior criminal history, both in the State of Ohio and offenses for which he did time in the State of Florida. And I'm going to sentence Mr. Johnson as follows: In 399616, as to count one and three, the felonies of the 1st degree, agg robbery and kidnapping, to a term of incarceration of nine years. With respect to the GSI one year concurrent with that nine year sentence. As to the RSP one year as well, concurrent.
 In 400550 as to the aggravated robbery and the kidnapping charge, again, nine years on each count concurrent with one another and consecutive to 399616.
* * *
 In 397780, as to counts one and three, the two kidnappings, nine years, and as to counts four, five and six, the agg robberies, nine years. Those days will run concurrent with one another and consecutive to the days in 400550 and 399616 for a total of 45 years.
* * *
 And it is the further finding of the Court that consecutive sentences in this case are necessary to protect the public from future crime as well as to punish the offender who stands before the Court absolutely unremorseful. And I don't believe that — I believe those sentences are proportionate to the seriousness of the offender's conduct and the danger that the offender poses to the public.
 This defendant preyed on women in downtown parking lots for a period of months. And by his own statement to one of the victims, rather than 12 cases of conduct of this nature, he was actually responsible for 15. He was also on post-release control at the time the offense was committed, and certainly this was not a single course of conduct but a one-man crime spree, if you will.
 Additionally, I've already articulated the fact that Mr. Johnson does have a substantial prior criminal history.
(Tr. 421-425.)
In the order of the elements presented in the above-mentioned nutshell version of the standard to be applied, the sentencing record clearly reflects that the trial court found that consecutive sentences: (1) were "necessary to protect the public from future crime as well as to punish the offender * * *," see Tr. 424; (2) "are proportionate to the seriousness of the offender's conduct and the danger that the offender poses to the public," see Tr. 425; and, (3) were appropriate because appellant "was already on post-release control when these offenses were committed," see Tr. 422. The sentencing court relied upon the following reasons in support of its findings: (1) appellant's "extensive prior criminal history" in Ohio and Florida; (2) appellant was unremorseful; (3) the serial offenses were committed against multiple victims over a period of months, which would indicate a pattern of criminal behavior; (4) appellant was on post-release control when he committed his "one-man crime spree," see Tr. 425; and, (5) appellant preyed solely on female victims in parking lots. These reasons sufficiently support the findings that the use of consecutive sentences was proportionate to the seriousness of appellant's conduct and the continuing danger he poses to the public, and that such sentences were necessary to protect the public from this unrepentant recidivist.
The fourth assignment of error is overruled.
At oral argument, and without briefing by the parties, the state conceded to problems in part of the sentencing of appellant, which we now address under the doctrine of plain error. Specifically, the state points to the sentences for the offenses of robbery and kidnapping. First, the robbery offense in the case of MG, see CR-399616, is a third degree felony. See R.C. 2911.02(A)(3). The available term of imprisonment for a third degree felony is 1 to 5 years pursuant to R.C. 2929.14(A)(3), yet the trial court imposed the unavailable sentence of 9 years. Second, with regard to all of the kidnapping offenses, the evidence indicated that the victims were left in a safe place unharmed by appellant after the commission of the offenses. By virtue of this "safe place/unharmed" condition, the offenses of kidnapping are second degree felonies, see R.C. 2905.01(C), punishable by a term of imprisonment of 2 to 8 years pursuant to R.C. 2929.14(A)(2). Yet, the trial court improperly sentenced appellant to a term of 9 years on kidnapping as a first degree felony under R.C. 2929.14(A)(1). Accordingly, the sentences dealing with these particular offenses are vacated, and the matter remanded for resentencing of these affected offenses.
Judgment affirmed in part and reversed and remanded in part for resentencing.
This cause is affirmed in part and reversed in part.
The court finds there were reasonable grounds for this appeal. It is, therefore, considered that said appellant and appellee each pay one-half of the costs herein.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
ANNE L. KILBANE, J., and COLLEEN CONWAY COONEY, J., CONCUR.
[1] In this case, which was not appealed from, the trial court convicted appellant of one count of possession of drugs.