The STATE of Ohio, Appellee,

v.

ASHER, Appellant.

[Cite as *State v. Asher* (1996), 112 Ohio App.3d 646.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950531.

Decided July 17, 1996.

648

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Christian J. Schaefer,* Assistant Prosecuting Attorney, for appellee.

*Ravert J. Clark,* for appellant.

MARIANNA BROWN BETTMAN, Judge.

This is a case which went terribly and seriously awry.

On April 13, 1995, defendant-appellant, Kenneth Asher, and his wife, Barbara Haunz–Asher, had an argument which took place in the couple's home. During the argument, Kenneth, who was on the first floor, yelled to his wife, who was on the second floor, that he was leaving the house for a while and that Barbara should leave the house because, if she were there when he returned, he might be tempted to hit her. Kenneth left while Barbara was still upstairs. Barbara left the house several hours later with the couple's son. The next day, Haunz–Asher filed a complaint against her husband. The state charged Asher with a violation of R.C. 2919.25(C), the domestic violence statute. R.C. 2919.25(C) provides:

"No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member."

On May 15, a bench trial in municipal court ensued. Defendant-appellant Asher was convicted and fined fifty dollars plus costs. This appeal followed.

Asher raises four assignments of error. In his first assignment of error, he alleges that his due process rights were violated because the complaint filed against him failed to inform him of the nature of the charge. In his second assignment of error, which we will discuss at some length because of its significance, Asher alleges that his due process rights were violated by failures of

the court and of the prosecutor to protect his right to a fair trial. In his third assignment of error, Asher argues that his conviction was against the manifest weight of the evidence. In his fourth and final assignment of error, Asher argues that his conviction was against the sufficiency of the evidence. We choose to address Asher's second assignment of error first.

## I. ASHER'S DUE PROCESS RIGHTS

Before we address the merits of the second assignment of error, we observe that frustration on the part of the prosecution is understandable when one spouse invokes the help of the criminal justice system against an allegedly abusive spouse, but then refuses to testify. Nevertheless, despite this sense of frustration and well-motivated concern for the victim, the prosecution *cannot* run roughshod over an accused's right to a fair trial, which is what happened in this case.

Although Barbara Haunz–Asher was not the defendant below, we look very closely at her role in these proceedings because we continue to adhere to the principle articulated in *State v. Bradley* (June 14, 1995), Hamilton App. No. C–940543, unreported, 1995 WL 356284, that coercion of a witness by the state can affect the due process rights of the defendant.

In the present case, Haunz–Asher, who we must remember was the victim in this case, not the accused, was coerced into testifying against her husband to such a degree by the state that Asher was deprived of his right to a fair trial.

### A. REFUSAL OF HAUNZ–ASHER TO TESTIFY

This case began routinely with Haunz–Asher called to the witness stand by the state. She was the prosecution's only witness and was the only witness in the case. She refused to testify, however, asserting several privileges and her Fifth Amendment right against self-incrimination. She read these rights to the court from index cards she carried with her to the witness stand. In an attempt to compel Haunz–Asher to testify, the prosecuting attorney made several coercive comments and, at one point, took the cards away from her. Haunz–Asher continued to refuse to testify. Thereafter, the prosecutor became quite heated, especially when the court refused to compel Haunz–Asher to testify or to find her in contempt. The court did, however, agree to continue the case in progress at the state's request. Asher objected to the continuance.

### B. THE GRAND JURY TESTIMONY

One of the most disturbing aspects of this case involves the invocation of the grand jury process to force Haunz–Asher's testimony against her husband.

## HAUNZ–ASHER'S GRAND JURY APPEARANCE

Later that month, on May 30, Haunz–Asher was, for a reason which is unclear, subpoenaed at 9:15 a.m. to appear before the grand jury at 9:45 a.m. that day. At that point in the proceedings, Haunz–Asher had done nothing but sign an affidavit and then refuse to testify against her husband. Haunz–Asher immediately contacted her attorney, who apparently intervened and rescheduled Haunz–Asher's appearance for the next day.

On May 31, Haunz–Asher appeared before the grand jury. The prosecutor informed the members of the grand jury [1]:

"This lady has filed domestic violence charges against her husband and then when we got into court she refused to answer any type of questions about what he had done to her and so the feeling that I think she gave everybody was that she may have lied on the affidavit and on her complaint and we just want to get to the bottom of that so that's who we are going to bring in now."

The prosecuting attorney told Haunz–Asher that she had received "immunity in this particular case with anything having to do with the domestic violence situation * * * so that anything you tell the grand jury today under oath cannot and will not be used against you in any kind of criminal prosecution relating to this offense." When Haunz–Asher requested that she be informed of the nature and scope of the grand jury's inquiry, the prosecuting attorney responded:

"Okay well really we can ask you, you know, any type of questions relating to the incident that myself or the grand jury feel is appropriate. And now that you have been given immunity so that nothing you say can incriminate you with regard to this incident, really the scope is whatever, wherever it goes.

"I am going to ask you some questions about the affidavit, the complaint, some of the questions you filled out and basically what happened between you and your husband on this date and those are the types of things that we are going to do today."

Haunz–Asher responded to all questions. Many of these questions were similar to those she refused to answer during her husband's trial on May 15.

■ We do not dispute that the prosecutor may bring a charge before the grand jury so long as he or she has probable cause to believe that an individual has committed an offense defined by statute. *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 611. Nevertheless, the grand jury is not subordinate to the prosecutor; it is an arm of the common pleas court.

---

1. The transcript of the grand jury proceeding is a part of the record on appeal because it was admitted into evidence at Asher's trial.

*State v. Schwab* (1924), 109 Ohio St. 532, 143 N.E. 29, paragraph one of the syllabus. The purpose of the grand jury is to investigate claims that crimes have been committed and to determine whether to charge an accused in a given case. R.C. 2939.01 through 2939.29; 1 Anderson's Ohio Criminal Practice and Procedure (2 Ed.1995), 18, Section 5.102.2. However, in this instance, it appears that the grand jury was used to accomplish a purpose for which it was not designed, namely as a means to coerce and compel the testimony of Haunz–Asher so that the prosecution could use it in its case against Asher. We believe this to be true for the reasons that follow.

First, even if probable cause existed to investigate whether Haunz–Asher had committed the crime of falsification, which is the reason the prosecutor told the grand jury she was there, at the very beginning of the grand jury proceeding Haunz–Asher was also told that she had received "immunity [for] anything having to do with the domestic violence situation." Consequently, it appears that Haunz–Asher had been given immunity for the very crime that the grand jury was called upon to investigate. If this were so, there was no reason for Haunz–Asher to be before the grand jury since its purpose is to investigate crimes and to determine whether to charge an accused.

What is even more disturbing is the fact that, by statute, a witness granted immunity may still be subject to criminal prosecution for falsification. See R.C. 2945.44(C). Hence, the subpoenaing of Haunz–Asher and the ostensible grant of immunity to her appears to have been used as a vehicle to force Haunz–Asher's testimony concerning the alleged dispute between her and her husband, and was an inappropriate use of prosecutorial discretion.

Even after Haunz–Asher testified before the grand jury, it was clear that her testimony was still insufficient to convict Asher of a violation of R.C. 2919.25(C). The state nevertheless continued with its case, again calling Haunz–Asher as its only witness.

## USE OF GRAND JURY TESTIMONY AT TRIAL

When the trial resumed, the state called Haunz–Asher to the stand and almost immediately attempted to impeach her with her grand jury testimony. The trial court allowed this over defense objection.

Evid.R. 607 requires "a showing of surprise and affirmative damage" before the court is authorized to declare a witness hostile and allow a party to impeach its own witness. *State v. Holmes* (1987), 30 Ohio St.3d 20, 30 OBR 27, 506 N.E.2d 204; *State v. Cantlebarry* (1990), 69 Ohio App.3d 216, 590 N.E.2d 342.

Surprise can be shown when a witness's testimony is materially inconsistent with a prior written or oral statement and when counsel did not have

reason to believe that the witness would recant when called to testify. *Holmes, supra; Cantlebarry, supra.* The reason for this rule is to ensure that a party does not call a witness for the sole purpose of impeaching her with statements which would otherwise be inadmissible. The issue of whether a party is taken by surprise by a witness "is a decision that is entrusted to the broad, sound discretion of the trial judge." *State v. Diehl* (1981), 67 Ohio St.2d 389, 391, 21 O.O.3d 244, 246, 423 N.E.2d 1112, 1114.

The record reflects that Haunz–Asher's testimony was not materially inconsistent with her grand jury testimony, and therefore, the prosecution made no showing of surprise. At all times, Haunz–Asher claimed that she and Asher were arguing in their house and that, in the midst of this argument, Asher announced he was leaving and told Haunz–Asher that she had better not be there when he returned or he might be tempted to hit her.

■ The prosecution also failed to demonstrate affirmative damage. Affirmative damage occurs when a party's own witness testifies to facts that contradict, deny or harm that party's trial position. *State v. Lewis* (1991), 75 Ohio App.3d 689, 600 N.E.2d 764; *State v. Moore* (1991), 74 Ohio App.3d 334, 598 N.E.2d 1224. We find no indication that this occurred.

We hold that the trial court abused its discretion in finding that the prosecuting attorney had made the requisite showing of surprise and affirmative damage before attempting to impeach Haunz–Asher. The prosecution's improper attempt to impeach her added to the already overly coercive environment in which Haunz–Asher testified.

## C. THE GRANT OF IMMUNITY

We next explore, in greater detail, the troubling aspect of the ostensible grant of immunity to Haunz–Asher.

The procedure for granting immunity is codified in R.C. 2945.44. When a witness refuses to answer a question at trial and invokes the Fifth Amendment privilege against self-incrimination, the *court of common pleas* shall compel the testimony of a witness *if both of the following apply:* the prosecutor makes a *written* request to the *court of common pleas* to order the witness to answer notwithstanding the claim of privilege *and* the *court of common pleas* informs the witness *on the record* that by answering, the witness will receive immunity. R.C. 2945.44(A)(1) and (2). Before granting immunity, the common pleas court must also determine, in its discretion, whether the prosecutor's request for immunity would further the administration of justice. *Id.;* see, also, *State ex rel. Ney v. Niehaus* (1987), 33 Ohio St.3d 118, 515 N.E.2d 914.

When Haunz–Asher appeared, once again, in municipal court as the only witness in the case against her husband, the prosecutor assured the court that Haunz–Asher had been granted immunity for any testimony. When disagreement arose on this point, the court decided to resolve the dispute by reviewing the transcript of Haunz–Asher's grand jury testimony. Based on this review, the court concluded that Haunz–Asher had been granted immunity and proceeded to inform her that she had immunity. This was a very serious mistake by the trial court.

Where, as here, a witness is testifying in a municipal court proceeding, the municipal court judge personally must determine whether the statutory procedure for granting immunity has been properly followed, and must ensure that some competent evidence of its existence, such as the common pleas entry granting immunity, is included in the municipal court record. A trial court *cannot presume* a grant of immunity, nor will we. It was error for the court to rely on verbal assurances by the prosecution that immunity had been granted. We are not disparaging the state's word that this occurred; we are holding that this process may not be cut short or circumvented by the trial judge, whose job it is personally to make an independent determination that immunity had been granted and granted properly. The court failed in this duty.

We hold that the trial court's observation that the grand jury transcript demonstrated that immunity had in fact been granted was both inadequate and incorrect.[2]

In addition to the court's improvident statement that Haunz–Asher had immunity, the trial judge also incorrectly told her that she could not be charged with falsification or perjury. The prosecutor agreed, which we also find very disturbing. As noted before, the legislature has determined that a witness who has been granted immunity may still be subject to prosecution for perjury, tampering with evidence or falsification. R.C. 2945.44(C).

Overall, we find no indication that Haunz–Asher was granted immunity pursuant to R.C. 2945.44, and we are convinced that both the trial court and the prosecuting attorney gave Haunz–Asher incorrect information in a further effort to force her testimony.

## D. APPLICATION OF BRADLEY

We reiterate and reaffirm our holding in *Bradley, supra,* that the extreme coercion of *any* witness, not just a defense witness, either by the court

---

2. At one point the court asked the prosecuting attorney, "Do I have something in writing [demonstrating a grant of immunity]?" However, the prosecuting attorney never directly answered this question, and the court never followed through on it.

or by the prosecutor, can so taint a witness's testimony that the due process rights of the defendant are affected prejudicially. We disagree with the assertions in our colleague's partial concurrence that the defendant's due process rights are affected only when testimony of his own witness is coerced. We do not take such a narrow view of due process. As stated by the United States Supreme Court years ago in *Lisenba v. California* (1941), 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, 180, "[t]he aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false."

Winning a conviction cannot be at any price. Throughout the trial, the prosecuting attorney, without appropriate reprimand or intervention by the court, was so overly coercive in compelling Haunz–Asher's testimony that no amount of cross-examination by Asher could cure the resultant taint. Therefore, we hold that, under the facts of this case, no weight can be given to Haunz–Asher's testimony. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 905–906; *State v. Robinson* (1955), 162 Ohio St. 486, 487, 55 O.O. 388, 388, 124 N.E.2d 148, 149. In so holding, we are not, as suggested by the partial concurrence, fashioning an exclusionary remedy. We are holding that there are some cases, this being one, where a witness's testimony is coerced to such a degree that the credibility of that testimony is destroyed. In doing so, we are adhering to the requirement of due process set forth by the Supreme Court in *Lisenba, supra,* which is to prevent fundamental unfairness in the use of evidence, be it true or false.

Without Haunz–Asher's testimony, there was insufficient evidence with which to convict Asher. Accordingly, we sustain Asher's second assignment of error. We do not do so, as suggested below as an "adventure with *obiter dictum,*" but as a separate, independent ground on which to overturn Asher's conviction.

## II.   WEIGHT AND SUFFICIENCY OF THE EVIDENCE

Although Asher's second assignment of error is dispositive of this case, we will also address his third and fourth assignments of error, which challenges the weight and sufficiency of the evidence.

Even if Haunz–Asher's testimony were believed, insufficient evidence was presented at trial to convict Asher. See *State v. Waddy* (1992), 63 Ohio St.3d 424, 588 N.E.2d 819; *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The one remark Asher made when the couple argued fell far short of what is needed to convict under R.C. 2919.25(C). This statute requires that a threat be one of "imminent harm." The threat Asher made was a conditional threat of possible future harm. See *State v. Collie* (1996), 108 Ohio App.3d 580,

671 N.E.2d 338. Accordingly, Asher's fourth assignment of error is also sustained.

Furthermore, since we have held in our disposition of the second assignment of error that Haunz–Asher's testimony was entitled to no weight, given the fact that there was no other evidence of Asher's guilt, his third assignment of error challenging the manifest weight of the evidence is also sustained.

Given the disposition of his other assignments of error, we hold that Asher's first assignment of error is moot and decline to address it. App.R. 12(A)(1)(c).

The judgment of the trial court is reversed, and Asher is discharged from further prosecution for these charges.

*Judgment reversed.*

GORMAN, P.J., concurs in part and in judgment.

PAINTER, J., concurs separately.

PAINTER, Judge, concurring separately.

This defendant committed *no crime* in twentieth-century America, but he could have stolen a loaf of bread in nineteenth-century France and been pursued less vigorously.

I concur in Judge Bettman's excellent opinion, but must add a few observations. In thirteen years on the Hamilton County Municipal Court, I heard thousands of domestic violence cases—some involved serious injuries, many involved alcohol or drugs, some involved dangerous and potentially volatile situations, some were just sad, and all required the judge to be possessed of more wisdom than possible to separate the wheat from the chaff, the serious from the less serious. But I never saw one like this, at least that made it this far.

This young couple, seemingly Middle–Americans, both employed at a major corporation, had an argument about child care. Busy young parents, with demanding jobs, often struggle to arrange care for their children and the transportation involved. The argument became a bit too intense, and this defendant did what counselors often suggest—he left to let things cool down. His only comment was that his wife should leave too, because *if* she were there when he came home, he *might* be *tempted* to hit her. He did not state that he would hit her, just that he might feel tempted to. Under R.C. 2919.25(C), this language is not a crime, because it does not threaten "imminent physical harm." Obviously, the defendant should not have said what he did, but not every intemperate statement is a criminal offense. Courts must be very careful in imposing criminal liability based on words alone. Were these words made criminal, who would be free? Ralph Kramden, who was never known to hit anyone, would be in jail forever.

Unfortunately, the wife overreacted to the situation, a mistake she readily admits. Evidently egged on by family members, one of whom was a police officer, she sought a restraining order. In yet another example of a little knowledge being dangerous, the police relative "helped" her obtain what she thought was a restraining order, but which was actually a temporary protection order ancillary to the filing of a criminal complaint. The wife testified that she did not intend to charge her husband with a criminal offense, and did not even realize that she had until later in this unfortunate saga. Having taken this one crucial, though unintentional misstep, she set in motion events beyond her control—and worse, seemingly beyond the control of the prosecution or the judge.

The prosecution and the court both got lost in the dispute over the wife's assertion of her Fifth Amendment rights, and failed to realize that the conduct charged *was not even a crime at all!* The case should have been dismissed, as the wife repeatedly requested, and these citizens allowed to resume their lives. Instead, the wife was badgered, bullied, and *hauled before the grand jury*—all in pursuit of a crime which did not even occur, and which was, even if it had, only a misdemeanor of the fourth degree. In alleged pursuit of "abuse" that did not occur, the system became the abuser, and the wife became, for the first time, a victim.

Everything that occurred up to the time of the grand jury debacle was bad enough, but I am baffled as to how any rational person could review the grand jury testimony *and then decide to proceed with the prosecution.* It was abundantly clear from the wife's testimony that no crime had been committed. A prosecution which had already gone seriously wrong became bizarre· when continued after the grand jury testimony. And then the judge, who had the last clear chance to end the agony, found the defendant guilty—based on no evidence—of an act that was not criminal in the first place!

At long last, this whole sorry spectacle will now end, and this young couple can go back to living their lives, doing their jobs, and raising their family without the infliction of the criminal justice system upon them.

GORMAN, Judge, concurring in part and in judgment only.

I agree that the evidence is insufficient to support Asher's conviction and, therefore, join the court in its judgment reversing the conviction and discharging Asher. I cannot, however, subscribe to the lead opinion's theory of witness coercion or its exclusionary remedy.

This court has found that the trial court improperly convicted Asher on insufficient evidence. See *Jackson v. Virginia,* 443 U.S. at 316, 99 S.Ct. at 2787,

61 L.Ed.2d at 571. Where such a firmly established constitutional basis as insufficiency of the evidence exists for overturning a conviction, an intermediate appellate court's expression of a novel, and unsupported, theory mandating the same result is unnecessary to the resolution of the case. The lead opinion's preoccupation with the second assignment of error, in reality, transforms into nothing more than an adventure with *obiter dictum.* See, *e.g., Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.* (1994), 70 Ohio St.3d 281, 283, 638 N.E.2d 991, 993.

The lead opinion relies upon the reasoning found in *State v. Bradley, supra. Bradley* and the lead opinion's analysis, however, are unsupported overextensions of a well-settled rule of law. A criminal defendant's right to a fair trial, guaranteed by the Sixth Amendment and the Due Process Clause, is violated when either the judge or the prosecutor by threats or accusations drives the *defendant's* witness—not the state's witness—from the stand. *Webb v. Texas* (1972), 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330, 333; *United States v. Pierce* (C.A.6, 1995), 62 F.3d 818, 832; *State v. Halley* (1994), 93 Ohio App.3d 71, 79, 637 N.E.2d 937, 942. Because driving a defendant's witness from the stand denies the defendant's right to compulsory process of witnesses, the result of the trial is inherently unfair, and the proper remedy is reversal of the conviction and remand to the trial court. *Webb v. Texas,* 409 U.S. at 98, 93 S.Ct. at 354, 34 L.Ed.2d at 333; *State v. Halley,* 93 Ohio App.3d at 79, 637 N.E.2d at 942. Here, Haunz–Asher was called as a witness by the state and not by the defense.

The lead opinion's unfounded extension of *Webb v. Texas* is further demonstrated by its selection *ex nihilo* of an exclusionary remedy. It holds that no weight can be given the coerced witness's testimony. Adoption of this remedy leads to untenable consequences at trial. Improper threats or accusations made against a defense witness by a trial judge, for example, would lead to a windfall for the prosecution by requiring the exclusion of the testimony of the defendant's witness. See, *e.g., State v. Pollard Carr III* (Feb. 26, 1992), Hamilton App. Nos. C–910034 and C–910035, unreported, 1992 WL 37745 (trial judge *sua sponte* interrogates defense witness on unrelated issue of whether she is a welfare cheat).

The theory advanced by the lead opinion is inapplicable to the facts of this case. Here, as in *State v. Halley,* the witness "stood by her testimony despite the prosecutor's efforts." 93 Ohio App.3d at 79, 637 N.E.2d at 942. Asher has not shown that the prosecutor's rough treatment of Haunz–Asher had any substantial effect on her testimony, although it undoubtedly disturbed her. In reality, Haunz–Asher, referred to in the lead opinion as the victim, initiated this process by filing a criminal complaint and then refusing to cooperate. I fail to comprehend how Asher was denied compulsory process in violation of the Sixth Amendment.

As the lead opinion acknowledges, a prosecuting attorney may bring a charge before the grand jury so long as there is probable cause to believe that the accused has committed an offense defined by statute. *Bordenkircher v. Hayes, supra.* Once the probable cause threshold has been met, the decision concerning which charges to present to the grand jury is a matter entirely within the prosecutor's discretion. *United States v. Batchelder* (1979), 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755. *Following a grant of immunity, the prosecutor would still have the sole discretion to subpoena an accused to testify before the grand jury to ascertain whether the crimes of perjury, falsification, or tampering with evidence have been committed. R.C. 2945.44(C); 1 Anderson's Ohio Criminal Practice and Procedure (2 Ed.1995), 232, Section 52.103. Absent irregularities in the selection of the grand jury, it is not an appellate court's business to meddle.*

Since Haunz–Asher is not an accused in this appeal, the record is silent as to any collateral crime she may have committed arising from these proceedings, if she was charged or indicted, or if she was granted immunity in a separate proceeding by a judge of the court of common pleas. The burden is on Asher to perfect the record on appeal by including these docket entries and transcripts. App.R. 9(B); *Knapp v. Edwards Laboratories* (1980), 61 Ohio St.2d 197, 199, 15 O.O.3d 218, 219, 400 N.E.2d 384, 385. On the state of the record certified to us, whether the prosecutor lacked probable cause to initiate grand jury proceedings is not demonstrated.

I, therefore, join the court in its judgment and in its analysis of the fourth assignment of error only.