**[Cite as *In re C.M.*, 2022-Ohio-240.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:                          CASE NO. 1-21-31

      C.M.,

                                    **O P I N I O N**

DELINQUENT CHILD.


Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2020 JG 37053

**Judgment Affirmed**

Date of Decision: January 31, 2022


APPEARANCES:

     *Linda Gabriele* **for Appellant**

     *Ashley R. Stansbery* **for Appellee**

**SHAW, J.**

{¶1} Child-appellant, C.M., brings this appeal from the July 23, 2021, judgment of the Allen County Common Pleas Court, Juvenile Division, adjudicating him a delinquent child and committing him to DYS after C.M. was found to have committed Aggravated Robbery in violation of R.C. 2911.01(A)(1), a first degree felony if committed by an adult, with an accompanying firearm specification pursuant to R.C. 2941.145. On appeal, C.M. argues that his adjudication was not supported by sufficient evidence, that it was against the manifest weight of the evidence, and that the only witness identifying him as a culprit in this matter was improperly compelled to testify by the trial court.

*Background*

{¶2} On October 21, 2020, a complaint was filed alleging that C.M. was a delinquent child due to committing Aggravated Robbery in violation of R.C. 2911.01(A)(1), a first degree felony if committed by an adult. The charge carried an accompanying firearm specification pursuant to R.C. 2941.145. The charge and specification stemmed from an incident that occurred in September of 2020 wherein fifteen-year-old C.M. and another juvenile allegedly entered a residence brandishing firearms and demanding money. One juvenile dragged his gun across a victim's face, causing minor injuries. The juveniles stole an iPhone 11 Pro Max from one of

the individuals present and left the residence. C.M. entered a denial to the allegations in the complaint.[1]

{¶3} On May 17-18, 2021, the matter proceeded to an adjudication hearing. Following the presentation of evidence, C.M. was adjudicated delinquent for Aggravated Robbery with the accompanying firearm specification as alleged in the complaint.

{¶4} On July 22, 2021, the case proceeded to disposition. C.M. was committed to the care and custody of the Ohio Department of Youth Services for a minimum period of one year to a maximum of the age of twenty-one for the Aggravated Robbery charge. He was ordered to serve a mandatory three year commitment at the Ohio Department of Youth Services for the firearm specification adjudication, prior to, and consecutive to the commitment for Aggravated Robbery. A judgment entry memorializing C.M.'s disposition was filed July 23, 2021. It is from this judgment that C.M. appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The Child-Appellant's adjudication as a delinquent child was based upon insufficient evidence.**

**Assignment of Error No. 2**
**The Child-Appellant's adjudication as a delinquent child for Robbery is against the manifest weight of the evidence.**

---

[1] C.M. was eventually indicted for Aggravated Robbery with a firearm specification and a discretionary serious youthful offender specification; however that indictment was dismissed and the case proceeded on the original juvenile court complaint.

**Assignment of Error No. 3**
**The Child-Appellant's conviction for the firearm specification is against the manifest weight of the evidence.**

**Assignment of Error No. 4**
**Compelling the testimony of the sole identification witness was an abuse of discretion and violated the Child-Appellant's right to due process and a fair trial.**

{¶5} Due to the nature of the discussion, we will address the fourth assignment of error first.

*Fourth Assignment of Error*

{¶6} In his fourth assignment of error, C.M. argues that the only witness at trial who identified him as one of the individuals who committed the Aggravated Robbery in this matter was improperly compelled to testify. More specifically, C.M. argues that the events leading to State's witness B.G. identifying C.M. as one of the perpetrators in this matter were coercive, and because B.G. was the only witness who identified C.M., his conviction should be reversed.

Relevant Authority

{¶7} Ohio Appellate Courts have held that where the trial court and/or the prosecutor coerced testimony at trial from a witness by making statements that "went beyond permissible admonitions and rose to the level of intimidation" a defendant's right to a fair trial is violated because the credibility of the witness's testimony is destroyed. *State v. Bradley*, 1st Dist. Hamilton No. C-940543, 1995

WL 356284; *State v. Asher*, 112 Ohio App.3d 646, 650, 679 N.E.2d 1147 (1st Dist.1996). However, "[m]erely warning a [] witness of the consequences of perjury [or contempt or other crimes] does not, in and of itself, violate a defendant's due process rights." *State v. Harrison*, 1st Dist. Hamilton No. C-150642, 2016-Ohio-7579, ¶ 6, citing *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995).

{¶8} A defendant's due process rights may be violated by unnecessarily strong admonitions against perjury that are aimed at discouraging a defense witness from testifying. *Id.*; *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351 (1972). To establish such a violation, the defendant must show that the admonition substantially interfered with the witness's free and voluntary choice to testify. *Pierce* at 833; *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997); *State v. Shurelds*, 3d Dist. Allen No. 1-20-35, 2021-Ohio-1560, ¶ 46.

Background Leading to Witness Coercion Claim

{¶9} Testimony at trial indicated that two young males entered the residence of Julius S. and Ashlyn T. at gunpoint and demanded money. The males were both wearing black pants and black hooded sweatshirts with the hoods up and the cords pulled. At the time the males entered the residence, there were three other adults present along with Julius and Ashlyn, in addition to multiple children. During the incident, one of the juveniles dragged a gun across Julius's face, leaving a minor injury. Before the young males left the residence, they took an iPhone 11 Pro Max

from Julius. B.G. was one of the adults present during the robbery, and she recognized the assailants.

{¶10} B.G. was properly subpoenaed to testify on the first day of the adjudication hearing. However, she did not appear for court pursuant to the subpoena. At the conclusion of the first day of the adjudication hearing, the State filed for a "material witness warrant." The court granted the State's request, but B.G. appeared voluntarily for the hearing the next day. (Doc. No. 61).

{¶11} B.G. testified to being at the residence when the robbery occurred. She testified that two people committed the robbery, but when she was asked at the adjudication hearing if she identified the individuals to the police on the date the robbery happened, she became combative, and the following exchange occurred.

> **[B.G.] It was a long time ago and I-, I got a lot going on. I don't-, I don't pay attention to-, that happened, like, last year, or whatever, and, like I said, I got a lot going on, and I don't know.**
>
> **[Prosecutor]: So you don't recall if you gave any names to officers when you spoke to them on that date?**
>
> **[B.G.] Uh, I don't know.**
>
> **[Prosecutor]: Your Honor, is it possible, at this time, to play State's Exhibit 3, in an attempt to refresh the witness' memory.**
>
> **THE COURT: Sure.**
>
> **\* \* \***
>
> **[B.G.] What do you wanna show?**

\* \* \*

THE COURT:  [Prosecutor], you want the video?

[B.G.]:  So, what is this? \* \* \*  This is the bodycam?

THE COURT:  Hang on a minute.  You're going to watch it-,…

[B.G.]:  No, I'm not.

THE COURT: …and….

[B.G.]:  I'm not gonna watch it.  I'm not.  Y'all might as well..

THE COURT:  [B.G.].

[B.G.]:  Y'all folks be lyin'.  I'm straight.

THE COURT:  [B.G.].  You're going to watch the video, like everybody else in the courtroom.

[B.G.]:  I'm not.

THE COURT:  …and then [the prosecutor] is going to ask you questions about it.

[B.G.]:  Okay.  Maybe I don't wanna remember this day.  Maybe I don't want to recreate this day.  Maybe I don't wanna watch this video.  And they never told me about no-, watchin' no video.

THE COURT:  Well, they've asked you a question, they've asked if something-,…

[B.G.]:  Okay, but like I said…

THE COURT:  …if you don't remember it…

[B.G.]:  It was traumatizing.  I don't wanna watch the video.

THE COURT:  That's fine.  They're going to play the video.

**[B.G.]:**  And I don't wanna listen to the video, either.

**THE COURT:**  You're going to sit there, and you can either watch it or listen to it, that's your choice, but-…

**[B.G.]:**  I don't want to.

**THE COURT:**  …they're going to play the video.

**[B.G.]:**  Well, listen.  Y'all might as well just do what y'all gotta do, 'cause I'm not doin' this, so.  If y'all wanna arrest me,…

**THE COURT:**  Go ahead play the video, [Prosecutor].

**[B.G.]:**  …or whatever, do that.  [Witness got up and left the witness stand.]  I'm not watchin' that video.

**[Prosecutor]:**  [BEGAN PLAYING VIDEO CONTAINED IN STATE'S EXHIBIT 3.]

**THE COURT:**  [B.G.], you can sit back down.

**[B.G.]:**  I don't wanna watch that video!

**THE COURT:**  You're going to sit back down.

**[B.G.]:**  I'm not watching that video!!

**THE COURT:**  You're going to sit-…

**[B.G.]:**  I'm not watching that video!!

**THE COURT:**  …back down.  Hang on a minute [Court instructing [prosecutor] to pause the video playback].

**\* \* \***

**THE COURT:**  You're going to sit..

-8-

**[B.G.]: I'm not watching the video.**

**THE COURT: …back down. If you don't, I'm going to find you in contempt-,…**

**[B.G.]: Well-,…**

**THE COURT: …and I'm going to put you in jail.**

**[B.G.]: …okay, well do that.**

**THE COURT: Sit back down, [B.G.].**

**[B.G.]: No, call my brother,…**

**THE COURT: Let's get through it-,…**

**[B.G.]: …I'm ready to go.**

**THE COURT: Go ahead and play it.**

**[B.G.]: I'm not watching this video!! I'm not!.**

**THE COURT: Just be quiet.**

**[Prosecutor]: [Resumed playing the video.]**

**[B.G.]: No. So, c'mon, 'cause if I walk out this door and y'all tackle me, I'll be mad as fuck. So.**

**DETECTIVE KUNKLEMAN: [B.G.]!**

**[B.G.]: Please! Just-, no! I'm not!**

**DETECTIVE KUNKLEMAN: Just-, don't get yourself in trouble.**

**[B.G.]: No!**

**THE COURT: [B.G.].**

**DETECTIVE KUNKLEMAN:** You're gonna get yourself in trouble!

**[B.G.]: I'M NOT WATCHING THIS VIDEO!!!!**

**THE COURT: Sit back down.**

**[B.G.]: I'm not watching the video! Y'all are fuckin weird.**

**THE COURT: [B.G.].**

**[B.G.]: I'm not watching the video!**

**THE COURT: You don't have to watch it.**

**[B.G.]: I'm not reliving this!**

**THE COURT: Just sit down there and-….**

**[B.G.]: No.**

**THE COURT: Sit down. Sit back down on the witness stand. Don't make this more difficult.**

**[B.G.]: I'm tellin' y'all, y'all play that video again, I'm just gonna walk right back out. I'm-, I'm sorry. Y'all wanted me to come up here, help y'all, whatever, but I'm not doin' that. I'm not. I wanna help my sister, and whatever I said that day is what I said. I'm not gonna sit here and watch this video.**

**THE COURT: Do you remember what you said?**

**[B.G.]: No. It was a long time ago. I w-, I-, I just lost my son with this shit happenin'. I got-, I'm takin' care of my little sister, I got too much goin' on. I told everbody, I'm not doin' this.**

**THE COURT: [B.G.]. There-, there's a way to handle this.**

**\* \* \***

-10-

[B.G.]: I'm not watchin' the video.

THE COURT: Listen to me. Don't interrupt me. I'm trying to carry on a civil conversation with you, okay? Understood?

[B.G.]: I mean, I hear you, yeah.

THE COURT: Okay.

[B.G.]: But you don't hear me, though, is what I'm sayin'.

THE COURT: The State has called you as a witness.

[B.G.]: Yeah.

THE COURT: They've actually issued a warrant for your arrest-…

[B.G.]: Yeah, they wanna come up here…

THE COURT: …to be here.

[B.G.]: Yup.

THE COURT: I understand that. But you're here now. You're going to sit through this until-…

[B.G.]: I'm,….

THE COURT: …we're done.

[B.G.]: Listen, I'm not sittin-, I'm not.

THE COURT: Yes, you are. They've asked you a question,-…

[B.G.]: And I answered it-,…

THE COURT: …and you said you couldn't remember.

-11-

[B.G.]:  …I don't know if I, um, stated names.

THE COURT:  So, at this point in time, I'm going to use you, I'm going to call you as <u>my</u> witness, then, and I'm going to have you sit down, and we're going to see if anything re-,…

[B.G.]: Or,…

THE COURT:  …helps refresh you recollection.

[B.G.]:  You could just arrest me, take me-, take me now.

THE COURT:  Excuse me?

[B.G.]:  You can just arrest me and take me now, 'cause I'm not.

THE COURT:  I'd rather not-…

[B.G.]:  I'M NOT WATCHING THIS!

THE COURT:  …arrest you.

[B.G.]:  I'm not watching it.

THE COURT:  That's fine.  Just-,….

[B.G.]:  And I'm not listening to it. [Witness began movements again to leave Courtroom.]

THE COURT:  That's fine.  Then just sit down.

[B.G.]:  And I'm not gonna sit here and watch it, too.

THE COURT:  Then just sit down.  I'm going to watch it.

[B.G.]:  I'm tellin' y-, al right, then I'm fittin' to, I'm fittin' to get out the room.

THE COURT:  No, you're not.  Sit down.  Sit down, because I want to watch it.  Sit down.

**[B.G.]: I'm not SITTING DOWN!! No!**

**THE COURT: Play the video. [B.G.], you're not free to leave at this point in time.**

**[B.G.]: Um, y'all can just arrest me. Y'all CANNOT si-, tell me I gotta stay in here. Y'all can't do that.**

**THE COURT: Yes, I can.**

**[B.G.]: So, please-, no, you can't.**

**THE COURT: Yes, I can.**

**[B.G.]: You can't. You can't.**

**THE COURT: Go ahead and take her into custody then. The Court finds that she's in direct contempt. Failure to obey Court's order.**

**[B.G.]: Corny as fuck. Ya also fuckin' lyin'. This is some weird-ass shit. Y'all got some weird asses in here.**

**[DEFENSE COUNSEL]: Your Honor, I-, I think perhaps there's another issue in this particular matter, as to-, as to her testifying. Potentially, she could be looking at a perjury charge. And if that's the situation, where she puts herself in a position * * * she would have a right to invoke * * * the Fifth Amendment[.]**

**THE COURT: Well, she has, she's not entitled to invoke the Fifth Amendment at this point in time. There's no charges being alleged against her.**

**[PROSECUTOR]: No.**

**[DEFENSE COUNSEL]: But I'm saying, potentially, if she gets up here and she says something-…**

**\* \* \***

> **THE COURT: I have-, I have no problem instructing her as to the ramifications of perjury. But she has no right to claim Fifth Amendment privilege at this point in time, because there's nothing against her. She has no interest in the matter-, any self-interest in the matter. So, she's not entitled to Fifth Amendment rights.**

(May 18, 2021, Tr. at 6-17). The trial court then asked the prosecutor how she wished to proceed if B.G. would not testify at all, and a recess was taken to give the prosecutor time to consider the matter.

{¶12} Upon reconvening, the court noted that B.G. had been found in direct contempt of court "as a result of [her] actions" including disobeying the court's orders to sit, listen, and cooperate. (*Id*. at 18). B.G., who was in the back of the courtroom, indicated that she understood the finding. The trial court explained to her the penalties for contempt, then stated:

> **at this point in time,** [the court] **is going to reserve * * * sentencing * * * if she wants to take the witness stand again, I'll allow you to take the witness stand. If you don't, then I'll impose, uh, sentencing. Um, but the Court is not going to have somebody disobey my orders, or act in the way that you did, in my Courtroom.**

(*Id*. at 19).

{¶13} B.G. indicated that she understood, and when the trial court asked if she wanted to take the stand again, B.G. said "I guess." (*Id*.) B.G. was sworn-in as a witness again and the following exchange occurred.

-14-

THE COURT:  Okay.  You may be seated.  I'm going to advise you that you need to testify truthfully and honestly in this matter.  Do you understand that?

[B.G.]:  Yeah.

THE COURT:  And that, if you do not, uh, you could be faced with a perjury charge.  Do you understand what that means?

[B.G.]:  Yeah.

THE COURT:  Okay.  Tell me what th-, tell me what your understanding of perjury is.

[B.G.]:  Um, when you say something happened and, I don't know, and it didn't happen.

THE COURT:  False test-, false testimony, or you say something that happened that didn't happen, or you make up facts, or make up statements that weren't true.  Do you understand that?

[B.G.]:  Yup.

THE COURT:  The State then could file a perjury charge or a falsification charge against you, uh, which would be a separate criminal proceeding against you.  Not anybody else.  Do you understand that?

[B.G.]:  yeah.

THE COURT:  Which could result in a fine or incarceration of yourself on the matter, as well.  Do you understand that?

[B.G.]:  Yeah.

THE COURT:  Okay.  Do you understand the oath that you have just taken?

[B.G.]:  Yeah.

**THE COURT:  And are you willing to now testify?**

**[B.G.]:  Yup.**

(Tr. at 19-21).

{¶14} B.G. then testified regarding the events in question, indicating that one of the assailants was C.M.  She testified she knew him from working together and she knew him "off the streets."  (May 18, 2021, Tr. at 27).  She also testified she knew his family.

{¶15} When B.G. was asked if C.M. was present in the courtroom, she testified that she was "not really tryin' to-, tryin' to look at him."  (*Id*. at 28).  After some further questions by the trial court and defense counsel, C.M. was identified in the courtroom by B.G.

{¶16} At the conclusion of B.G.'s testimony, the trial court thanked her and asked her if she had anything else to say with regard to contempt.  B.G. stated,

> **like I said, I was just tryin' to do what's right.  That was wrong. You know, my sister * * * I was just tryin' to make sure everything was straight with her.  I told her, like, you didn't want to go further with this, I don't wanna go further with it.  She wanted to, so that's why I'm here to day.  And I, actually, like I- ya'll said, I had to be here, I didn't wanna be here and, yeah, that's all I got to say.**

(*Id*. at 39).  B.G. then apologized to the court for her actions.  After she testified, B.G. was sentenced to one day in jail for her direct contempt of court.

Analysis

{¶17} On appeal, C.M. argues that the events that transpired in the courtroom leading to B.G.'s testimony amounted to coercion by the trial court and the prosecutor, and that without B.G.'s testimony "under duress" C.M. would not have been convicted. After reviewing what transpired, we disagree that B.G. was "coerced" into testifying, and we disagree that her testimony was given under duress.

{¶18} The preceding cited segments from the second day of the adjudication hearing established that B.G. was *extremely* combative with the trial court and court personnel. She left her seat and refused to sit still while any audio or video was played in an attempt to refresh her recollection. Her outbursts and poor demeanor continued despite the trial court trying to calm the situation.

{¶19} The adjudication hearing was eventually recessed altogether due to B.G.'s lack of cooperation, and upon returning to the courtroom, the trial court gave B.G. the *option* of retaking the witness stand. Then, when B.G. *decided* to proceed with testifying, the trial court did not tell her to testify as to what she had said before to the police, or that she had better recall the incident; rather, the trial court simply stated that she should testify *truthfully*. The trial court also gave a perjury admonition, but *only because it was requested by defense counsel.*

{¶20} B.G. then gave her testimony and identified C.M. as one of the perpetrators in this matter. There is simply no indication in the record that B.G. was

compelled to testify by the trial court or by the prosecutor. She stated she wanted to do the right thing for her sister.

{¶21} This case is completely unlike others wherein testimony has found to be compelled by the trial court and/or prosecutor. Threats of punishment were not made by the trial court or the prosecution to force B.G. to testify as they were in *State v. Asher*, 112 Ohio App.3d 646, 650 (1st Dist.1996) or *State v. Bradley*, 1st Dist. Hamilton No. C-940543, 1995 WL 356284, *1. Rather, to the extent that any statements regarding potential punishment were made by the trial court, they were made only in the context of preventing B.G.'s ongoing outbursts. As we have stated previously, simply warning a witness of the consequences of perjury or contempt does *not* violate a defendant's due process rights. *See State v. Shurelds*, 3d Dist. Allen No. 1-20-35, 2021-Ohio-1560, ¶ 46. Further, although C.M. argues that B.G. was "coerced," "[w]itnesses are frequently 'coerced' to testify through the use of subpoenas[,]" and there is no indication that more pressure than that was placed on her here. *State v. Williams*, 8th Dist. Cuyahoga No. 68613, 1996 WL 17333, *5. There are simply no indications here that B.G. was forced to testify to any version of any particular story and there certainly is no evidence that she was encouraged to testify falsely.

{¶22} After reviewing what transpired at the adjudication hearing at length regarding B.G.'s testimony, we cannot find that there was any coercion here. B.G.

willingly testified after she made numerous outbursts in the courtroom and conducted herself poorly. She was then given the option to testify after her initial outbursts and she exercised a free and voluntary choice to do so. We can find no error with the process here and we do not find that C.M.'s right to a fair trial was violated. Therefore, C.M.'s fourth assignment of error is overruled.

*First, Second, and Third Assignments of Error*[2]

{¶23} In his first assignment of error, C.M. argues that his delinquency adjudication for Aggravated Robbery with a firearm specification was not supported by sufficient evidence. In his second and third assignments of error, he argues that the trial court's determinations regarding Aggravated Robbery and the accompanying firearm specification were against the manifest weight of the evidence.

Standards of Review

{¶24} At the outset, it is important to emphasize that "[t]he standards for evaluating the weight and sufficiency of the evidence in juvenile adjudications are the same as the standards used in adult criminal cases." *In Re: A.K.*, 1st Dist. Hamilton No. C-210178, 2021-Ohio-4199, ¶ 22 citing *In re: A.P.*, 1st Dist. Hamilton Nos. C-190553, 2020-Ohio-5423, ¶ 9, 18. With regard to C.M.'s sufficiency challenge, "[w]hether the evidence is legally sufficient to sustain a verdict is a

---

[2] As the first three assignments of error all deal with a discussion of the evidence presented at trial, we will address them together.

question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, ¶ 6. Therefore, our review is de novo. *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 3. In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus (superseded by constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102, (1997), fn. 4) following Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781 (1979). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶25} By contrast, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier-of-fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier-of-fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the

manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

### Controlling Statutes

**{¶26}** C.M. was adjudicated delinquent for committing Aggravated Robbery in violation of R.C. 2911.01(A)(1), a first degree felony if committed by an adult. That statute reads:

> **(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:**
>
> **(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]**

R.C. 2911.01(A)(1).

**{¶27}** The charge also carried a firearm specification pursuant to R.C. 2941.145(A), which requires the factfinder to determine that

> **the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense.**

Evidence Presented

{¶28} On September 14, 2020, Julius S. and Ashlyn T. lived at 1425 W Spring Street in Lima, Ohio. Ashlyn was pregnant with Julius's child and she had planned to have a baby shower that day; however, at the last minute, she cancelled the shower by a posting on Facebook. Two female friends of hers did not see the Facebook cancellation, so they came over anyway. Julius also had a friend over so there were five adults in the house and multiple children under five years old.

{¶29} Shortly before 5 p.m., Ashlyn heard a knock on the back door of the residence and she went to answer it. When she opened the door, a younger male with a gun pushed into the residence. He was followed by another young male. According to Ashlyn and Julius, both young males were wearing black pants, and black hooded-sweatshirts with the hoods up and the strings pulled tight. They also both had guns.

{¶30} One of the individuals demanded money and dragged his gun across Julius's face, leaving a red mark. The other individual stayed on or near the back porch, and told the girls that everything was going to be okay. Julius's iPhone 11 Pro Max was taken, then the assailants left the residence through the back door.

{¶31} B.G., one of Ashlyn's friends who was present at the house, recognized the two assailants. She knew one to be C.M., because she worked with

him previously and knew him from the "streets." She thought the other individual went by the name of "Kels" but was uncertain of his actual name.

{¶32} Law enforcement was called and several officers responded to the scene and spoke with the individuals who were present. After officers left the area, Julius called them to let them know he had tracked his iPhone to the area of 615 E Fifth Street in Lima. Officers went to the designated area and noted that there was no specific address of "615 E Fifth Street" but there was a "613" and a "617." At 613 E Fifth Street, there was a "large group of individuals" outside, including numerous juveniles. (May 17, 2021, Tr. at 22). One officer who was familiar with C.M. saw C.M. standing in the yard of 613 E Fifth Street when the officers turned their cruiser onto the road, but when the officers got closer C.M. went inside the residence.

{¶33} The individuals outside the residence at 613 E Fifth Street were not cooperative with law enforcement, so the officers left.

{¶34} C.M. was ultimately charged for his role in the crime, though his accomplice remained at large. No firearms were ever recovered.

Analysis

{¶35} In challenging his conviction and the accompanying firearm specification on appeal, C.M. first argues that the identification of him as one of the

perpetrators in this crime was insufficient. More specifically, he argues that B.G.'s testimony was not credible and was coerced.

{¶36} We have already rejected the argument that B.G.'s testimony was coerced. As to his claim regarding identification, it is well-settled that the testimony of one witness is sufficient to prove a fact of consequence. *State v. Martinez*, 3d Dist. Union No. 14-19-28, 2020-Ohio-4883, ¶ 25, citing *State v. Thompson*, 10th Dist. Franklin No. 16AP-812, 2017-Ohio-8375, ¶ 5 ("the testimony of one witness, if believed, is sufficient to establish the elements of an offense."); *State v. Ruggles*, 12th Dist. Warren No. CA2019-05-038, 2020-Ohio-2886, ¶ 53, citing *State v. Dawson*, 5th Dist. Licking No. 2008-CA-122, 2009-Ohio-2331, ¶ 33. Thus for this reason alone his argument related to identification is not well-taken.

{¶37} Moreover, although C.M. argues that B.G.'s identification was not credible, there was circumstantial evidence to support her identification. C.M. was located in the yard where the stolen phone was tracked. When the police neared the residence, C.M. went inside. Thus there was some evidence to corroborate B.G.'s identification.

{¶38} We are aware that at the adjudication hearing defense counsel attempted to suggest through his cross-examination that Ashlyn's friends who were present at the time of the robbery may have had some connection to individuals who committed the crime. Defense counsel pointed out that D.M., one of the girls

present during the robbery, had her address listed on a police report as 613 E Fifth Street, the same location where the cell phone indicated that it was located after being taken. However, law enforcement explained that addresses for witnesses auto-filled from prior sheets and that the addresses frequently were not changed, thus making them incorrect on the reports. In fact, D.M. told officers at the time of the robbery that she lived at 411 Nye St. and B.G. testified at the adjudication hearing that D.M. lived on Nye St. Thus while the address listed on the police report raised a potential issue, this was an issue for the factfinder to determine, and we will not second-guess a factfinder regarding credibility, particularly where there was an explanation for the discrepancy. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

**{¶39}** Next, C.M. claims that no firearms were ever recovered and that there was no evidence that the purported weapons brandished during the robbery were actually operable firearms. Thus he contends that the evidence was insufficient to support the Aggravated Robbery charge and the accompanying specification, and that the adjudication and specification finding were against the weight of the evidence.

**{¶40}** Contrary to C.M.'s argument, multiple witnesses testified that both assailants were carrying what the witnesses believed to be firearms. The Ohio Supreme Court has held that while the State must prove beyond a reasonable doubt that the firearm was operable, "such proof can be established beyond a reasonable

doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." *State v. Murphy*, 49 Ohio St.3d 206, (1990) at syllabus, citing *State v. Gaines*, 46 Ohio St.3d 65 (1989). Courts have held that a conviction for a firearm-related offense is supported "[d]espite the [S]tate's failure to produce a gun at trial, [when] there was substantial, uncontradicted evidence in the record indicating that appellant displayed and brandished a gun during the commission of a theft offense." *State v. Nelson,* 12th Dist. Clermont No. CA2006-04-030, 2007-Ohio-2294, at ¶ 18; *State v. Anderson*, 9th Dist. Summit No. 24304, 2009-Ohio-837, ¶ 8. That evidence is precisely what was presented here.

**{¶41}** Based on the clear and uncontroverted testimony of the witnesses at trial, and how C.M. represented himself with a firearm according to the witnesses, we find that there was sufficient evidence presented to support the adjudication and the specification, and that the adjudication and specification were not against the weight of the evidence. Therefore, for all of these reasons, we reject C.M.'s challenges to the sufficiency and weight of the evidence. At the very least, we cannot find that this is one of the exceptional cases where the evidence weighs heavily against the adjudication. Accordingly, C.M.'s first, second, and third assignments of error are overruled.

*Conclusion*

{¶42} For the foregoing reasons C.M.'s assignments of error are overruled and the judgment of the Allen County Common Pleas Court, Juvenile Division, is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**

**/jlr**